In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2559

KRAFT FOODS GROUP BRANDS LLC,

*Plaintiff-Appellee,*

*v.*

CRACKER BARREL OLD COUNTRY STORE, INC., *et al.,*

*Defendants-Appellants,*

*and*

JOHN MORRELL & CO.,

*Intervening Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 780 — **Robert W. Gettleman**, *Judge.*

ARGUED SEPTEMBER 9, 2013 — DECIDED NOVEMBER 14, 2013

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a trademark infringement suit (see Lanham Act, 15 U.S.C. §§ 1051 *et seq.*) brought by Kraft against Cracker Barrel Old Country Store (we can disregard the other parties). The district judge granted Kraft a preliminary injunction against the sale by Cracker Barrel Old

Country Store of food products to grocery stores under the name Cracker Barrel, which is a registered trademark of Kraft. To prevent confusion (an especially apt goal in a trademark case), we'll call Cracker Barrel Old Country Store "CBOCS," as do the parties.

Kraft is a well-known manufacturer of food products sold in grocery stores. Its products include a wide variety of packaged cheeses, a number of them sold under the trademarked "Cracker Barrel" label. Kraft has been selling cheese in grocery stores under that name for more than half a century. Thousands of grocery stores carry Kraft cheeses bearing that label. Kraft does not sell any non-cheese products under the name Cracker Barrel.

CBOCS is a well-known chain of low-price restaurants (it opened its first restaurant in 1969), 620 in number at last count, many of them just off major highways. Upon learning recently that CBOCS planned to sell a variety of food products (not including cheese, however), such as packaged hams, in grocery stores under its logo, "Cracker Barrel Old Country Store" (the last three words are in smaller type in the logo), Kraft filed this suit. It claims that many consumers will be confused by the similarity of the logos and think that food products so labeled are Kraft products, with the result that if they are dissatisfied with a CBOCS product they will blame Kraft.

Kraft acknowledges that a trademark does not entitle its owner to prevent all other uses of similar or even identical marks. "It would be hard, for example, for the seller of a steam shovel to find ground for complaint in the use of his trade-mark on a lipstick." *L.E. Waterman Co. v. Gordon*, 72 F.2d 272, 273 (2d Cir. 1934) (L. Hand, J.). And likewise iden-

tical marks used on similar products sold through different types of sales outlet might cause no confusion—indeed Kraft does not question CBOCS's right to sell the food products at issue under the name Cracker Barrel in CBOCS's restaurants, in CBOCS's small "country stores" that adjoin the restaurants, or by mail order or on the Web. It objects only to their sale in grocery stores. The district judge found the likelihood of confusion, and of resulting harm to Kraft, from CBOCS's selling through such outlets sufficient to warrant the grant of a preliminary injunction. These are factual determinations, which bind us unless clearly erroneous, *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427–28 (7th Cir. 1985)—a reinforcing consideration being the need for expeditious determination of whether to order preliminary relief. The district judge must act with a certain haste, and we must hesitate to nitpick his findings and casually remand for further proceedings bound to cause additional delay. Kraft moved for a preliminary injunction on March 8 of this year; it was granted on July 1; it is now November. The grant of the preliminary injunction followed extensive discovery, the presentation of expert evidence, and some live testimony. Of the allegedly infringing CBOCS products, only the spiral hams had been shipped to grocery stores before the preliminary injunction was issued; and by then the stores had sold them all.

Below, copied from CBOCS's website, is a picture of the logo that appeared on CBOCS food products shipped to grocery stores.



Up close at least, it looks different from the label "Cracker Barrel" that appears on Kraft's cheeses. Yet even if a Cracker Barrel cheese and a CBOCS ham (or other food products) were displayed side by side in a grocery store, which would make a shopper likely to notice the difference between the labels, the words "Cracker Barrel" on both labels—and in much larger type than "Old Country Store" on CBOCS's label—might lead the shopper to think them both Kraft products.

Most consumers of Cracker Barrel cheese must know that it's a Kraft product, for the name "Kraft" typically though not invariably appears on the label, as in the following picture:



Kraft is concerned with the potential for confusion of shoppers at the 16,000 or so grocery stores (or similar retail entities) that sell Cracker Barrel cheeses, if the stores also carry CBOCS food products under the CBOCS logo (not only ham but also delicatessen meats, bacon, sausages, jerky, meat glazes, baking mixes, coating mixes, oatmeal, grits, and gravies—all are sold by CBOCS). Were Cracker Barrel cheeses and Cracker Barrel meats exhibited side by side on the shelf, the difference in the appearance of the logos of the two brands might as we said lead some consumers to think they were made by different companies—but might lead others to think the opposite, since different products of the same manufacturer are often exhibited together. If on the other hand the Kraft cheeses and CBOCS food products are at different locations in the store, some consumers might forget the difference between the logos and think all the products Kraft products. Cf. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898–99 (7th Cir. 2001). Even savvy consumers might be fooled, because they know that producers often vary the appearance of their trademarks.

It's not the fact that the parties' trade names are so similar that is decisive, nor even the fact that the products are similar (low-cost packaged food items). It is those similari-

ties coupled with the fact that, if CBOCS prevails in this suit, similar products with confusingly similar trade names will be sold through the same distribution channel—grocery stores, and often the same grocery stores—and advertised together. (In the brief period before the preliminary injunction was issued, in which CBOCS hams were sold in grocery stores, an online ad for Cracker Barrel Sliced Spiral Ham by a coupons firm provided a link to a coupon for Kraft's Cracker Barrel cheeses.) The competing products would also be likely to appear in the same store circulars. Such similarities and overlap would increase the likelihood of consumer confusion detrimental to Kraft. See *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 682 (7th Cir. 2001); *Ty, Inc. v. Jones Group, Inc.*, *supra*, 237 F.3d at 900–01.

Still another reason to expect confusion is that both Cracker Barrel cheeses and most meat products that CBOCS has licensed for sale to grocery stores are inexpensive— under $5. Generally only very cost-conscious consumers are apt to scrutinize carefully the labels of the less expensive items sold in a grocery store. Familiarity is likely to have made the name Cracker Barrel salient to grocery shoppers, and so any product bearing that name might be attributed to Kraft even if close scrutiny of the label would suggest that the product might well have a different origin.

If a significant number of consumers confused the names and thought CBOCS's products were made by Kraft, Kraft could be badly hurt. A trademark's value is the saving in search costs made possible by the information that the trademark conveys about the quality of the trademark owner's brand. The brand's reputation for quality depends on the owner's expenditures on product quality and quality

control, service, advertising, and so on. Once the reputation is created, the firm will obtain greater profits because repeat purchases and word-of-mouth endorsements will add to sales and because consumers will be willing to pay a higher price in exchange for a savings in search costs and an assurance of consistent quality. These benefits depend on the firm's ability to maintain that consistent quality. When a brand's quality is inconsistent, consumers learn that the trademark does not enable them to predict their future consumption experiences from their past ones. The trademark does not then reduce their search costs. They become unwilling to pay more for the branded than for the unbranded good, and so the firm no longer earns a sufficient return on its expenditures on promoting the trademark to justify them.

The particular danger for Kraft of CBOCS's being allowed to sell food products through the same outlets under a trade name confusingly similar to Kraft's "Cracker Barrel" trade name is that if CBOCS's products are inferior in any respect to what the consumer expects—if a consumer has a bad experience with a CBOCS product and blames Kraft, thinking it the producer—Kraft's sales of Cracker Barrel cheeses are likely to decline; for a consumer who thinks Kraft makes bad hams may decide it probably makes bad cheeses as well. See, e.g., *Ty Inc. v. Perryman*, 306 F.3d 509, 510 (7th Cir. 2002); *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (Friendly, C.J.).

Granted, there is a consumer interest that is in tension with the interest in avoiding confusion. Consumers benefit from having a variety of products to choose among. CBOCS wants to offer grocery shoppers products that it sells in its restaurants. Think Starbucks—a notable example of a chain

of restaurants (coffee houses) that sells its major food product (coffee) in grocery stores as well. The preliminary injunction prevents CBOCS from doing that pending resolution of the case. But CBOCS has and utilizes an alternative channel to its consumers, outside the restaurant channel—an alternative channel of ever greater significance in the electronic age: the Web. CBOCS's 620 restaurants invite their legions of customers to visit the CBOCS website, which displays pictures of the hams and other food products that it sells and links for buying the food from CBOCS online. Some of the foods are also sold in CBOCS's "country stores" adjoining the restaurants. Yet doubtless CBOCS thinks it can reach additional consumers by placing its food products in grocery stores—else it wouldn't have issued the licenses that invited this suit (which it anticipated).

So competition in food products will be harmed if CBOCS prevails in this suit, to the extent that the sale of CBOCS food products in grocery stores confuses consumers and as a result impairs sales of Kraft products for reasons having nothing to do with any product-quality problems with Kraft. But competition will be helped to the extent that grocery stores are able to offer their customers an additional product line. The weighing and balancing of these competing interests with any precision are not feasible undertakings in a preliminary-injunction proceeding, and probably not in a full trial either. Imponderables are likely to dominate.

About all that is feasible at the preliminary-injunction stage is for the judge to estimate the likelihood that the plaintiff will prevail in a full trial and which of the parties is likely to be harmed more by a ruling, granting or denying a preliminary injunction, in favor of the other party, and com-

bine these findings in the manner suggested in such cases as *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992): "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." See also *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (per curiam).

But for the grant of a preliminary injunction to be proper, the harm to the plaintiff also must be judged irreparable—meaning not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor. See, e.g., *Abbott Laboratories v. Mead Johnson & Co.*, *supra*, 971 F.2d at 16–17; *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). For if the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process.

Consistent with this analysis, if the plaintiff has a strong likelihood of prevailing in the full trial, and the costs to him if the preliminary injunction is denied are at least as great as the costs to the defendant if it is granted, and the plaintiff's costs could not be fully recouped by him in a final judgment in his favor, the injunction should be issued. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387–88 (7th Cir. 1984); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982); 11A Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2948.3, pp. 202–11 (3d ed. 2013); cf. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). That seems the situation here, given the district judge's findings. The likelihood of

confusion seems substantial and the risk to Kraft of the loss of valuable goodwill and control therefore palpable. And as emphasized in the *Abbott Laboratories* and *Processed Plastics* opinions cited earlier, irreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial). And on the other side of the ledger, there is no information on how many new customers CBOCS can expect to obtain by selling through grocery stores, given that it already sells its food products at its country stores and on its website. So there is no basis for concluding that it is losing heavily as a result of not being able to sell through grocery stores until and unless it obtains a final judgment in its favor.

So the grant of the preliminary injunction must be affirmed. But mainly for future reference we want to say something about the consumer survey that Kraft presented in support of its claim of confusion. Consumer surveys conducted by party-hired expert witnesses are prone to bias. There is *such* a wide choice of survey designs, none foolproof, involving such issues as sample selection and size, presentation of the allegedly confusing products to the consumers involved in the survey, and phrasing of questions in a way that is intended to elicit the surveyor's desired response—confusion or lack thereof—from the survey respondents. See Robert H. Thornburg, "Trademark Surveys: Development of Computer-Based Survey Methods," 4 *John Marshall Rev. Intellectual Property L.* 91, 97 (2005); Michael Rappeport, "Litigation Surveys—Social 'Science' as Evidence," 92 *Trademark Rep.* 957, 960–61 (2002); Jacob Jacoby,

"Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys," 92 *Trademark Rep*. 890, 890 (2002); see also Joseph Sanders, "Science, Law, and the Expert Witness," 72 *Law & Contemp. Probs.*, Winter 2009, pp. 63, 73–75. Among the problems identified by the academic literature are the following: when a consumer is a survey respondent, this changes the normal environment in which he or she encounters, compares, and reacts to trademarks; a survey that produces results contrary to the interest of the party that sponsored the survey may be suppressed and thus never become a part of the trial record; and the expert witnesses who conduct surveys in aid of litigation are likely to be biased in favor of the party that hired and is paying them, usually generously. All too often "experts abandon objectivity and become advocates for the side that hired them." *Id*. at 75.

Of course, judges and jurors have their own biases and blind spots. As Judge Jerome Frank noted many years ago, dissenting in a pair of trademark cases that *Seventeen* magazine had brought against the makers of "Miss Seventeen" girdles, "as neither the trial judge nor any member of this court is (or resembles) a teen-age girl or the mother or sister of such a girl, our judicial notice apparatus will not work well unless we feed it with information directly obtained from 'teen-agers' or from their female relatives accustomed to shop for them." *Triangle Publications, Inc. v. Rohrlich*, 167 F.2d 969, 976 (2d Cir. 1948). And so a judge's finding that confusion was likely was "nothing but a surmise, a conjecture, a guess." *Id.*

Nevertheless it's clear that caution is required in the screening of proposed experts on consumer surveys. Kraft's

expert in this case was Hal Poret, an experienced survey re-searcher, and we won't hold it against him that he appears to be basically a professional expert witness. See www.pli.edu/Content/Faculty/Hal_Poret/_/N-4oZ1z138h0? ID=PE830174 (visited Nov. 13, 2013). Poret was able to ob-tain a random or at least representative sample of 300 Amer-ican consumers of whole-ham products, email them photo-graphs of the CBOCS sliced spiral ham, and ask them in the email whether the company that makes the ham also makes other products—and if so what products. About a quarter of the respondents said cheese. It's difficult to know what to make of this. The respondents may have assumed that a company with a logo that does not specify a particular food product doesn't make *just* sliced spiral ham. So now they have to guess what else such a company would make. Well, maybe cheese.

Poret showed a control group of 100 respondents essen-tially the same ham, but made by Smithfield—and none of these respondents said that Smithfield also makes cheese. Poret inferred from this that the name "Cracker Barrel" on the ham shown the 300 respondents had triggered their rec-ollection of Cracker Barrel cheese, rather than the word "ham" being the trigger. That is plausible, but its relevance is obscure. Kraft's concern is not that people will think that Cracker Barrel cheeses are made by CBOCS but that they will think that CBOCS ham is made by Kraft, in which event if they have a bad experience with the ham they'll blame Kraft.

Also it's very difficult to compare people's reactions to photographs shown to them online by a survey company to their reactions to products they are looking at in a grocery

store and trying to decide whether to buy. The contexts are radically different, and the stakes much higher when actual shopping decisions have to be made (because that means parting with money), which may influence responses.

In some cases an attractive alternative to a survey might be the use of statistical data to determine the effect of the allegedly infringing logo. Suppose that before this suit was filed, CBOCS products had been sold for a time in a number of grocery stores. Probably in some of them Kraft Cracker Barrel cheese would have been displayed side by side with CBOCS hams plus similar meat products sold at comparable prices, while in other stores the cheeses and the hams would have been displayed in different areas of the store, and still other grocery stores would have carried CBOCS hams but not Kraft Cracker Barrel cheese. By examining the "lift" (greater sales) if any that CBOCS hams obtain by proximity to the Kraft Cracker Barrel label, an expert witness might be able to estimate the extent of consumer confusion. The greater the lift (and hence the greater the confusion) the greater the likelihood of a consumer's blaming Kraft as the supposed maker of the CBOCS hams if the consumer has a bad experience with the hams. Such a study would not have been feasible in this case, however, given the grant of the preliminary injunction, which has kept CBOCS hams with its Cracker Barrel logo out of grocery stores for now. Nor have we such confidence in the reliability of such a study that we would think it an adequate basis for refusing to grant preliminary injunctions in trademark cases.

We can imagine other types of expert testimony that might be illuminating in a case such as this—testimony by experts on retail food products about the buying habits and

psychology of consumers of inexpensive food products. "Although the ordinary consumer's mindset is central to trademark law and policy, neither courts nor commentators have made any serious attempt to develop a framework for understanding the conditions that may affect the attention that can be expected to be given to a particular purchase. Some of the classic judicial descriptions cast the ordinary consumer as 'ignorant … unthinking and … credulous' or 'hasty, heedless and easily deceived.' In other cases, the courts have bristled at the 'claimed asininity' of the buying public, suggesting instead that the average buyer is 'neither savant nor dolt,' but is one who 'lacks special competency with reference to the matter at hand but has and exercises a normal measure of the layman's common sense and judgment.' For the most part, however, the debate is a vacuous war of words, uninformed by any careful theoretical modeling of consumer psychology or empirical study of consumer behavior." Thomas R. Lee, Glenn L. Christensen & Eric D. DeRosia, "Trademarks, Consumer Psychology, and the Sophisticated Consumer," 57 *Emory L.J.* 575, 575–76 (2008) (footnotes deleted).

We have doubts about the probative significance of the Poret survey. But the similarity of logos and of products, and of the channels of distribution (and the advertising overlap) if CBOCS is allowed to sell its products through grocery stores under its Cracker Barrel logo, and the availability to the company of alternatives to grocery stores for reaching a large consumer public under the logo, provide adequate support for the issuance of the preliminary injunction. The judgment is therefore

AFFIRMED.