POSNER, Circuit Judge.
On July 5 of this year, the Governor of Wisconsin signed into law a statute that the Wisconsin .legislature had passed the previous month. So far as relates to this appeal, the statute prohibits a doctor, under threat of heavy penalties if he defies the prohibition, from performing an abortion (and in Wisconsin only doctors are allowed to perform abortions, Wis. Stat. § 940.15(5)) unless he has admitting privileges at a hospital no more than 30 miles from the clinic in which the abortion is performed. Wis. Stat. § 253.095(2).
A doctor granted admitting privileges by a hospital becomes a member of the hospital’s staff and is authorized to admit patients to that hospital and to treat them there; that is the meaning of “admitting privileges.” Of course any doctor (in fact any person) can bring a patient to an emergency room to be treated by the doctors employed there (these days called *788 “hospitalists”), and all' Wisconsin abortion clinics already have transfer agreements with 'local hospitals to streamline the process. A hospital that has an emergency room is obliged to admit and to treat a patient requiring emergency care even if the patient is uninsured. 42 U.S.C. § 1395dd(b)(l).
Planned Parenthood of Wisconsin and Milwaukee Women’s Medical Services (also known as Affiliated Medical Services) — the only entities that operate abortion clinics in Wisconsin — filed suit (joined by two physicians affiliated with these clinics, whom we’ll largely ignore in an effort to simplify our opinion) challenging the constitutionality of the new statute under 42 U.S.C. § 1983, which provides a tort remedy for violations of federal law by state employees. The suit was filed promptly on July 5 and simultaneously with the filing the plaintiffs moved in the district court for a temporary restraining order. The court granted the motion on July 8 and later converted it to a preliminary injunction against enforcement of the statute pending a trial on the merits. The sparse evidentiary record ends on August 2, the day the preliminary injunction was granted. The defendants — the Attorney General of Wisconsin and other state officials involved in enforcing the statute (we refer to the defendants collectively as the “state”) — have appealed. 28 U.S.C. § 1292(a)(1).
Discovery is continuing in the district court, but the judge has stayed the trial (originally set for November 25) pending resolution of this appeal. The stay had been requested by the defendants, and in granting it the judge explained that “(1) the stay will not prejudice plaintiffs; and (2) a stay may simplify or clarify the issues in question and streamline the case for trial. Except for the lingering uncertainty (which will not be eliminated until this matter is resolved through final appeal), plaintiffs are not prejudiced by the stay now that an injunction is in place. As plaintiffs acknowledge, additional time may allow them to develop the record as to their ability to obtain admitting privileges at local hospitals. Furthermore, the Seventh Circuit’s review of the prehminary injunction order will likely provide guidance to this court and the parties on the law and its application to the facts here. If anything, it would be inefficient for this court to address the merits of plaintiffs’ claims until obtaining this guidance from the Seventh Circuit” (citations omitted).
All we decide today is whether the district judge was justified in entering the preliminary injunction. Evidence presented at trial may critically alter the facts found by the district judge on the basis of the incomplete record compiled in the first month of the suit, and recited by us.
Although signed into law on July 5, a Friday, the statute required compliance— the possession of admitting privileges at a hospital within a 30-mile radius of the clinic at which a doctor performs abortions — by July 8, the following Monday. So there was only the weekend between the governor’s signing the bill and the deadline for an abortion doctor to obtain those privileges. There was no way the deadline could have been met even if the two days hadn’t been weekend days. It is unquestioned that it takes a minimum of two or three months to obtain admitting privileges (often a hospital’s credentials committee, which decides whether to grant admitting privileges, meets only once a month), and often it takes considerably longer. Moreover, hospitals are permitted rather than required to grant such privileges.
All seven doctors in Wisconsin who perform abortions but as of July 8 did not have visiting privileges at a hospital within a 30-mile radius of their clinic applied for *789 such privileges forthwith. But as of the date of oral argument of this appeal — five months after the law .would have taken effect had it not been for the temporary restraining order — the application of one of the doctors had been denied and none of the other applications had been granted. Had enforcement of the statute not been stayed, two of the state’s four abortion clinics — one in Appleton and one in Milwaukee — would have had to shut down because none of their doctors had admitting privileges at a hospital within the prescribed 30-mile radius of the clinics, and a third clinic would have lost the services of half its doctors. The impossibility of compliance with the statute even by doctors fully qualified for admitting privileges is a compelling reason for the preliminary injunction, albeit a reason that diminishes with time. There would be no quarrel with a one-year deadline for obtaining admitting privileges as distinct from a one-weekend deadline, and if so that might seem to argue for a one-year (or even somewhat shorter) duration for the preliminary injunction. But there should be no problem in getting the case to trial and judgment well before July 8, 2014. The plaintiffs are ready to go to trial. The defendants contemplate very limited discovery. Furthermore there are more reasons for the preliminary injunction than just the impossibility of compliance with the statute within the deadline set by-the statute.
The stated rationale of the Wisconsin law is to protect the health of women who have abortions. Most abortions — in Wisconsin 97 percent — are performed in clinics rather than in hospitals, and proponents of the law argue that if a woman requires hospitalization because of complications from an abortion she will get better continuity of care if the doctor who performed the abortion has admitting privileges at a nearby hospital. The plaintiffs disagree. They argue that the statute would do nothing to improve women’s health — that its only effect would be to reduce abortions by requiring abortion doctors to jump through a new hoop: acquiring admitting privileges at a hospital within 30 miles of their clinic. No documentation of medical need for such a requirement was presented to the Wisconsin legislature when the bill that became the law was introduced on June 4 of this year. The legislative deliberations largely ignored the provision concerning admitting privileges, focusing instead on another provision — a requirement not challenged in this suit that a woman seeking an abortion obtain an ultrasound examination of her uterus first (if she hadn’t done so already), which might induce her to change her mind about having an abortion. Wis. Stat. § 253.10(3)(c)(l)(gm).
No other procedure performed outside a hospital, even one as invasive as a surgical abortion (such as a colonoscopy, or various arthroscopic or laparoscopic procedures), and even if performed when the patient is under general anesthesia, and even though more than a quarter of all surgery in the United States is now performed outside of hospitals, Karen A. Cullen et al., “Ambulatory Surgery- in the United States: 2006,” Centers for Disease Control and Prevention: National Health Statistics Reports No. 11, Sept. 4, 2009, p. 5, www.cdc.gov/ nchs/data/nhsr/nhsrOll.pdf (visited Dec. 19, 2013, as were the other websites cited in this opinion), is required by Wisconsin law to be performed by doctors who have admitting privileges at hospitals within a specified, or indeed any, radius of the clinic at which the procedure is performed. That is true even .for gynecological procedures such as diagnostic dilation and curettage (removal of tissue from the inside of the uterus), hysteroscopy (endoscopy of the uterus), and surgical completion of miscarriage (surgical removal of fetal tissue remaining in the uterus after a miscar *790 riage, which is to say a spontaneous abortion), that are medically similar to and as dangerous as abortion — or so at least the plaintiffs argue, without contradiction by the defendants. These procedures, often performed by the same doctors who perform abortions, appear to be, from a medical standpoint, virtually indistinguishable from abortion.
An issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications. The rate of complications resulting in hospitalization from colonoscopies, for example, appears to be three to six times the rate of complications from abortions. Compare Cynthia W. Ko et al., “Serious Complications Within 30 Days of Screening and Surveillance Colonoscopy Are Uncommon,” 8 Clinical Gastroenterology & Hepatology 166, 171-72 (2010), with two studies cited in an amicus curiae brief filed by the American College of Obstetricians and Gynecologists, Tracy A. Weitz et al., “Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver,” 103 Am. J. Public Health 454, 457-58 (2013), and Kelly Cleland et al., “Significant Adverse Events and Outcomes After Medical Abortions,” 121 Obstetrics & Gynecology 166, 169 (2013). Wisconsin’s annual report on abortions suggests a higher incidence of complications but it is unclear whether they all require hospitalization and it still is lower than the reported incidence of complications from colonos-copies. Wisconsin Department of Health Services, “Reported Induced Abortions in Wisconsin, 2012” (Aug 2013), www.dhs. wisconsin.gov/publications/p4/p45360-12. pdf. It is possible that because of widespread disapproval of abortion, abortions and their complications may be underre-ported — some women who experience such complications and are hospitalized may tell the hospital staff that the complications are from a miscarriage. But as yet there is no evidence in the record of such under-counting. The state’s own report on abortions, just cited, lists (at table 9 of the report) only 11 complications out of the 6,692 abortions of Wisconsin residents reported in 2012 — a rate of less than 1.6 tenths of 1 percent (1 per 608 abortions). And the report does not indicate how many of the complications involved hospitalization or whether 6,692 was an under-count of the number of abortions.
We asked the state’s lawyer at oral argument what evidence he anticipated producing at the trial on the merits. He did not mention evidence of alleged under-counting of abortions, but only that the state was looking for women in Wisconsin who had experienced complications from an abortion to testify. He did not mention any medical or statistical evidence. This may explain why the trial, originally scheduled for November 25, only four and a half months after the suit was filed, was expected to last only a couple of days. And it is why we think it most unlikely that the trial can’t be completed well before the one-year anniversary of the date of the statute’s enactment.
The district judge said in a footnote in his opinion that while he would “await trial on the issue, ... the complete absence of an admitting privileges requirement for clinical [i.e., outpatient] procedures including for those with greater risk is certainly evidence that Wisconsin Legislature’s only purpose in its enactment was to restrict the availability of safe, legal abortion in this State, particularly given the lack of any demonstrable medical benefit for its requirement either presented to the Legislature or [to] this court” (emphasis in original). A fuller enumeration of consider *791 ations based on purpose would include the two-day deadline for obtaining admitting privileges, the apparent absence of any medical benefit from requiring doctors who perform abortions to have such privileges at a nearby or even any hospital, the differential treatment of abortion vis-a-vis medical procedures that are at least as dangerous as abortions and probably more so, and finally the strange private civil remedy for violations: The father or grandparent of the “aborted unborn child” is entitled to obtain damages, including for emotional and psychological distress, if the abortion was performed by a doctor who violated the admitting-privileges provision. Wis. Stat. § 253.095(4)(a). Yet if the law is aimed only at protecting the mother’s health, a violation of the law could harm the fetus’s father or grandparent only if the mother were injured as a result of her abortion doctor’s lacking the required admitting privileges. But no proof of such injury is required to entitle the father or grandparent to damages if he proves a violation and resulting emotional or psychological injury to himself.
However, the purpose of the statute is not at issue in this appeal. In urging affirmance the plaintiffs reserve the issue for trial, arguing to us only that the law discourages abortions without medical justification and imposes an undue burden on women. And the state on its side does not defend the statute as protecting fetal life but only as protecting the health of women who have abortions.
Wisconsin’s statute is not unique. Six states have laws nearly identical to Wis-consin’s: Ala.Code § 26-23E-4; Miss. Code § 41 — 75—1(f); Mo. Stat. § 188.080; N.D. CentCode § 14-02.1-04(1); Tenn. Code § 39-15-202(h); Tex. Health & Safety Code § 171.0031(a)(1). Five more have similar though less stringent requirements relating to admitting privileges for abortion doctors: Ariz.Rev.Stat. §. 36-449.03(C)(3); Fla. Stat. § 390.012(3)(c)(l); Ind.Code § 16-34-2-4.5; Kan. Stat. § 65-4a09(d)(3); Utah Admin. Code R432-600-13(2)(a). The plaintiffs argue that such laws, which are advocated by the right to life movement, are intended to hamstring abortion. The defendants deny this. We needn’t take sides. Discovering the intent behind a statute is difficult at best because of the collective character of a legislature, and may be impossible with regard to the admitting-privileges statutes. Some Wis-consin legislators doubtless' voted for the statute in the hope that it would reduce the abortion rate, but others may have voted for it because they considered it a first step toward making invasive outpatient procedures in general safer.
As now appears (the trial may cast the facts in a different light), the statute, whatever the intent behind it (if there is a single intent), seems bound to have a substantial impact on the practical availability of abortion in Wisconsin, and not only because of the unreasonably tight implementation deadline. Virtually all abortions in Wisconsin are performed at the plaintiffs’ four clinics; no other clinics in the state perform abortions and hospitals perform only a small fraction of the state’s abortions; and a significant fraction of the clinics’ doctors don’t have admitting privileges at hospitals within 30-mile radii of their, clinics.
What is more, because few doctors in Wisconsin perform abortions, those who do often work at more than one clinic, so that the statute would require them to obtain admitting privileges at multiple hospitals. And whether any of the hospitals would give these doctors admitting privileges is unknown. It is true that federal law prohibits hospitals that receive federal funding, including Catholic hospitals, from denying admitting privileges merely because a doctor performs abortions. 42 U.S.C. *792 § 300a-7(c)(l)(B) (the “Church Amendments”). Yet Wisconsin State Senator Mary Lazich, one of the authors of the admitting-privileges law, was seemingly unaware of the Church Amendments, as were indeed officials of the largest Catholic hospitals in Wisconsin, which before they were informed of the amendments were emphatic that their religious beliefs would preclude their granting admitting privileges to doctors who perform abortions. Akbar Ahmed, “Abortion Ruling Mired in Confusion,” Milwaukee Journal Sentinel, July 27, 2013, p. Al, www. jsonline.com/news/statepolitics/courb-file-shows-confusion-over-wisconsin-abortion-regulation-law-b9961373zl-217196251. html# ixzz2mcyeJ5ba. In the words of the chief medical officer of one such hospital, ‘Wheaton Franciscan Healthcare is a ministry of the Catholic church.... For that reason, if it’s known to us that a doctor performs abortions and that doctor applies for privileges at one of our hospitals, our hospital board would not grant privileges.” Id.
So not only would allowing the new law to go into effect on July 8 have wreaked havoc with the provision of abortions in Wisconsin because of the months it would have taken for the doctors who perform abortions to obtain admitting privileges within the prescribed radii of their clinics; in addition their requests for such privileges would have encountered resistance at Catholic hospitals — and perhaps at other hospitals as well, given the widespread hostility to abortion and the lack of any likely benefit to a hospital from granting such privileges to an abortion doctor.
The criteria for granting admitting privileges are multiple, various, and unweighted. They include how frequently the physician uses the hospital (that is, the number of patient admissions), the quantity of services provided to the patient at the hospital, the revenue generated by the physician’s patient admissions, and the physician’s membership in a particular practice group or academic faculty (“closed staff’ arrangements). Barry R. Furrow et al., Health Law § 14-15, pp. 707-08 (2d ed.2000); Elizabeth A. Weeks, “The New Economic Credentialing: Protecting Hospitals from Competition by Medical Staff Members,” 36 J. Health L. 247, 249-52 (2003). The absence of definite standards for the granting of admitting privileges makes it difficult not only to predict who will be granted such privileges at what hospitals and when, but also to prove an improper motive for denial. Akbar Ahmed, “Hospitals Can’t Deny Privileges,” Milwaukee Journal Sentinel, Aug. 7, 2013, p. Al, www.jsonline.co m/news/statepolitics/wisconsin-attorney-general-says-hospitalscani^deny-admit-ting-privileges-to-abortion-doctors-b997046-218608951.html, points out for example that according to the Senior Counsel of the National Women’s Law Center, “in other states that have recently passed privileges requirements for abortion providers, religiously affiliated hospitals have denied the doctors’ applications by citing their failure to meet other standards, such as admitting a certain number of patients per year. In Mississippi, a Baptist hospital did not provide doctors at an abortion clinic with an application for privileges because none of its staff would write letters in support of the doctors, according to a court affidavit provided by the clinic’s attorneys at the Center for Reproductive Rights.”
Pretext aside, a common and lawful criterion for granting admitting privileges (though it has been criticized by the American Medical Association, see AMA, “Opinion 4.07-Staff Privileges,” www.ama-assn. org/ama/pub/physician-resources/medieal-ethics/code-medicalethics/ opinion407.page) is the number of patient admissions a doctor can be expected to produce for the *793 hospital — the more the better, as that means more utilization of hospital employees and resources and hence more fees for the hospital. But the number of patient admissions by doctors who perform abortions is likely to be negligible because there appear to be so few complications from abortions and only a fraction of those require hospitalization — probably a very small fraction. An even smaller fraction will afflict women who happen still to be near the hospital at which the doctor who performed the abortion has admitting privileges when the complication arises. The state does not dispute the district court’s finding that “up to half of the complications will not present themselves until after the patient is home.”
But what is certain and also not disputed by the state is that banning abortions by doctors who cannot obtain the requisite admitting privileges within the span of a weekend is bound to impede access to abortions. It would have created (had it not been for judicial intervention) a hiatus of unknown duration (but duration measured in months rather than in weeks or days) in which a critical number of the few doctors who perform abortions in Wiscon-sin would have been forbidden to do so, under threat of heavy penalties if they disobeyed.
There cannot have been a felt sense of urgency on the state’s part for making the law effective too abruptly to allow compliance with it. It has been 40 years since Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), was decided, legalizing (most) abortion throughout the United States, and it could not have taken the State of Wisconsin all this time to discover the supposed hazards of abortions performed by doctors who do not have admitting privileges at a nearby hospital. The state can without harm to its legitimate interests wait a few months more to implement its new law, should it prevail in this litigation.
One reason it can wait is that its expressed concern about the hazards resulting from abortions performed by doctors who don’t have admitting privileges at a nearby hospital has intersected a movement in the hospital industry (an industry in ferment, as everyone now knows) to restrict admitting privileges on economic grounds. See Weeks, supra, at 248-49, 252-53 (“for example, hospitals may refuse to grant initial or continuing staff privileges to physicians who own or have other financial interests in competing healthcare entities, refer patients to competing entities, have staff privileges at any other area hospitals, or fail, to admit some specified percentage of their patients to the hospital”); Peter J. Hammer & William M. Sage, “Antitrust, Health Care Quality, and the Courts,” 102 Colum. L.Rev. 545, 567-68 and n. 58 (2002). The trend in the hospital industry is for the hospital to require the treating physician to hand over his patient who requires hospitalization to physicians employed by the hospital, rather than allowing the treating physician to continue participating in the patient’s treatment in the hospital. Wisconsin is trying to buck that trend — but only with regard to abortions, though there is no evidence that the complications to which abortion can give rise require greater physician continuity than other outpatient procedures. And there is no evidence that women who have complications from an abortion recover more quickly or more completely or with less pain or discomfort if their physician has admitting privileges at the hospital to which the patient is taken for treatment of the complications.
The state devotes most of its briefing in this court not to the merits but instead to arguing that the plaintiffs cannot be allowed to maintain this suit because their *794 rights have not been violated. The state does not deny that they may be injured by the statute. But it argues that no rights of theirs have been violated but only rights of their patients, if it is true (which of course the defendants deny) that the statute is a gratuitous interference with a woman’s right to an abortion.
Yet the cases are legion that allow an abortion provider, such as Planned Parenthood of Wisconsin or Milwaukee Women’s Medical Services, to sue to enjoin as violations of federal law (hence litigable under 42 U.S.C. § 1983) state laws that restrict abortion. See, e.g., Isaacson v. Horne, 716 F.3d 1213, 1221 (9th Cir.2013) (“recognizing the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy, the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients”); Richard H. Fallon, Jr., “As-Applied and Facial Challenges and Third-Party Standing,” 113 Harv. L.Rev. 1321, 1359-61 (2000). The reason for allowing such third-party standing in the present case is different from but analogous to the reason that persuaded the Supreme Court, beginning with Roe v. Wade, to waive the mootness defense to a suit by a pregnant woman challenging a state law restricting abortion. The suit could not be litigated to judgment before she gave birth; and so if mootness were allowed as a defense, restrictions on abortion could not effectively be challenged by the persons whose rights the restrictions infringe. That was a practical bar to insisting on first-party standing. The bar in this case is the extraordinary heterogeneity of the class likely to be affected by the statute. If two of the four abortion clinics in the state close and a third shrinks by half, some women wanting an abortion may experience delay in obtaining, or even be unable to obtain, an abortion yet not realize that the new law is likely to have been the cause. Those women are unlikely to sue. Other women may be able to find an abortion doctor who has admitting privileges at a nearby hospital, yet incur costs and delay because the law has reduced the number of abortion doctors and hence access. The heterogeneity of the class is likely to preclude class action treatment; and while one or a handful of women might sue, the entire statute would be unlikely to be enjoined on the basis of such a suit.
The principal objection to third-party standing is that it wrests control of the lawsuit from the person or persons primarily concerned in it. See, e.g., Main-Street Organization of Realtors v. Calumet City, 505 F.3d 742, 746 (7th Cir.2007); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.9.3, pp. 720-26 (3d ed.2008). For an extreme example, imagine that if A broke his contract with B, a stranger to both of them could sue A for breach of contract, leaving B out in the cold. But that is not a problem in a case such as this. Wisconsin women who have or want to have an abortion are not seeking damages from the state, and so are not losing control over their legal rights as a result of litigation by clinics and doctors. They are (or would be, if they were plaintiffs) seeking the same thing the clinics are seeking (with greater resources): invalidating the statute.
Anyway there is an alternative ground for standing, unrelated to third-party standing, in this case. The Supreme Court held in Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (the companion case to Roe v. Wade), that doctors (two of the plaintiffs in this case are doctors) have first-party standing to challenge laws limiting abortion when, as in Doe v. Bolton and the present case as *795 well, see Wis. Stat. §§ 253.095(3), (4), penalties for violation of the laws are. visited on the doctors. See also Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 903-04, 909, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Karlin v. Foust, 188 F.3d 446, 456 n. 5 (7th Cir.1999); Planned Parenthood of Wisconsin v. Doyle, 162 F.3d 463, 465 (7th Cir.1998); 13A Wright, Miller & Cooper, supra, pp. 748-50. The state argues that none of these precedents governs because none of them “grapple[d] with whether [42 U.S.C.] § 1983 creates a cause of action for abortion providers or clinics to assert the rights of their patients.” But nearly all the cited cases in which doctors and abortion clinics were found to have had standing had been filed pursuant to section 1983, and the justicia-bility of such cases is not in question.
Apart from the issue of standing just discussed, the legal principles applicable to our consideration of the appeal are not in contention between the parties. The task of the district court asked to grant a preliminary injunction is “to estimate the likelihood that the plaintiff will prevail in a full trial and which of the parties is likely to be harmed more by a ruling, granting or denying a preliminary injunction, in favor of the other party, and combine these findings in the manner suggested in such cases as Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6,12 (7th Cir.1992): ‘the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.’ ” Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc., 735 F.3d 735, 740 (7th Cir.2013); see also NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1568 (7th Cir.1996); Grocery Outlet Inc. v. Albertson’s Inc., 497 F.3d 949, 951 (9th Cir.2007) (per curiam); O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 1028-29 (10th Cir.2004) (en banc) (per curiam), affirmed, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 597 (3d Cir.2002). This formulation is a variant of, though consistent with, the Supreme Court’s recent formulations of the standard, in such cases as Winter v. National Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008): “A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.”
Because of the uncertainty involved in balancing the considerations that bear on the decision whether to grant a preliminary injunction — an uncertainty amplified by the unavoidable haste with which the district judge must strike the balance — we appellate judges review his decision deferentially.
The state concedes that its only interest pertinent to this case is in the health of women who obtain abortions. But it has neither presented evidence of a health benefit (beyond an inconclusive affidavit by one doctor concerning one abortion patient in another state, as we’ll see), or rebutted the plaintiffs’ evidence that the statute if upheld will harm abortion providers and their clients and potential clients.
And it is beyond dispute that the plaintiffs face greater harm irreparable by the entry of a final judgment in their favor than the irreparable harm that the state faces if the implementation of its statute is delayed. For if forced to comply with the statute, only later to be vindicated when a final judgment is entered, the plaintiffs will incur in the interim the disruption of the services that the abortion clinics provide. With the closure of two and a half *796 of the state’s four abortion clinics if their doctors fail to obtain admitting privileges, including one clinic responsible for half the abortions performed in the state, their doctors’ practices will be shut down completely unless and until the doctors obtain visiting privileges at nearby hospitals. Patients will be subjected to weeks of delay because of the sudden shortage of eligible doctors — and delay in obtaining an abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal.
Some patients will be unable to afford the longer trips they’ll have to make to obtain an abortion when the clinics near them shut down — 60 percent of the clinics’ patients have incomes below the federal poverty line. One of the clinics that will close is Planned Parenthood’s clinic in Appleton, which, as shown in the accompanying map, is in the approximate center of the state. The remaining abortion clinics are in Madison or Milwaukee, about 100 miles south of Appleton. A woman who lives north of Appleton who wants an abortion may (unless she lives close to the Minnesota border with Wisconsin and not far from an abortion clinic in that state) have to travel up to an additional 100 miles each way to obtain it. And that is really 400 miles — a nontrivial burden on the financially strapped and others who have difficulty traveling long distances to obtain an abortion, such as those who already have children. For Wisconsin law requires two trips to the abortion clinic (the first for counseling and an ultrasound) with at least twenty-four hours between them. Wis. Stat. § 253.10(3)(c). When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered.
[[Image here]]
*797 The state has made no attempt to show an offsetting harm from a delay of a few months in the implementation of its new. law (should it be upheld after a trial). States that have passed similar laws have allowed much longer implementation time than a weekend — for example, Mississippi has allowed 76 days, Alabama 114 days, Texas 103, and North Dakota 128. See 2012 Miss. Gen. Laws, 331 (H.B. 1390), enjoined, Jackson Women’s Health Org. v. Currier, 940 F.Supp.2d 416, 424 (S.D.Miss.2013); 2013 Ala. Legis. Serv. 2013-79 (H.B. 57), enjoined, Planned Parenthood Southeast, Inc. v. Bentley, No. 2:13cv405-MHT, 2013 WL 3287109, at *8 (M.D.Ala. June 28, 2013); 2013 Tex. Sess. Law Serv. 2nd Called Sess. Ch. 1 (H.B. 2), permanent injunction stayed pending appeal, Planned Parenthood of Greater Texas Surgical Health Services v. Abbott, 734 F.3d 406 (5th Cir.2013); 2013 North Dakota Laws Ch. 118 (S.B. 2305), enjoined, MKB Management Corp. v. Burdick, No. 1:13-cv-071, 2013 WL 3779740, at *2 (D.N.D. July 22, 2013).
Is there such urgency to implementing the law, because Wisconsin is rife with serious complications from abortion and requiring admitting privileges to hospitals within short distances of abortion clinics is essential to preventing such complications? As noted earlier, the state has presented no evidence of either reason for the weekend deadline. Complications of abortion are estimated to occur in only one out of 111 physician-performed aspiration abortions (the most common type of surgical abortion); and 96 percent of complications are “minor.” Weitz et al., supra, p. 457; cf. Cleland et al., supra. The official Wis-consin figure, cited earlier, is much lower: one complication per 608 abortions. New complications require hospitalization; studies cited earlier found that only 1 in 1,915 aspiration abortions (0.05%) and 1 in 1,732 medical abortions (0.06%) result in complications requiring hospitalization. Weitz et al., supra, p. 459; Cleland et al., supra, p. 169 table 2.
What fraction of these hospitalizations go awry because the doctor who performed the abortion did not have admitting privileges at the hospital to which the woman was taken is another unknown in a ease in which thus far the state has been chary in the presentation of evidence. True, one doctor, who said he’s been treating complications from abortions for 29 years, furnished the defendants with an affidavit describing a case in which, he opines, a woman with a complication from an abortion might have avoided a hysterectomy had her abortion doctor, who did not have admitting privileges, remained in closer touch with her. That is the only evidence in the record that any woman whose abortion results in complications has ever, anywhere in the United States, been made worse off by being “handed over” by her abortion doctor to a gynecologist employed by the hospital to which she’s taken. One (doubtful) case in 29 years is not impressive evidence of the medical benefits of the Wisconsin statute. And we note that as a protection for Wisconsin women who have abortions, abortion clinics — uniquely, it appears, among outpatient providers of medical services in Wisconsin — are required to adopt the transfer protocols, mentioned earlier, which are intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization. See Wis. Admin. Code Med. § 11.04(g).
The defendants argue that obtaining admitting privileges operates as a kind of Good Housekeeping Seal of Approval of a physician. But that benefit does not require that the hospital in which he obtains the privileges be within a 30-mile radius of the clinic. Cf. Women’s Health Center of West County, Inc. v. Webster, 871 F.2d 1377, 1378-81 (8th Cir.1989) (upholding an *798 admitting privileges requirement with no geographic restriction). Several abortion doctors in Wisconsin who lack admitting privileges at hospitals within 30 miles have them at hospitals beyond that radius. Yet they are not excused by the statute from having to obtain the same privileges from a hospital within 30 miles.
Furthermore, nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion. He doesn’t have to accompany her to the hospital, treat her there, visit her, call her, or indeed do anything that a doctor employed by the hospital might not do for the patient.
Also the statute does not distinguish between surgical and medical abortions. The latter term refers to an abortion induced by a pill given to the patient by her doctor: she takes one pill in the clinic, goes home, and takes a second pill a few days later to complete the procedure. (The first pill ends the fetus’s life, the second induces the uterus to expel the remains.) Her home may be far from any hospital within a 30-mile radius of her doctor’s clinic, but close to a hospital outside that radius. If she calls an ambulance, the paramedics are likely to take her to the nearest hospital — a hospital at which her doctor is unlikely to have admitting privileges. Likewise in the case of surgical abortions when complications occur not at the clinic, during or'immediately after the abortion, but after the patient has returned home: because of distance she may no longer have ready access to the hospitals near the clinic at which the abortion was performed, even though she may live near a hospital at which the doctor who performed her abortion does not have admitting privileges.
The cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose an “undue burden” on women seeking abortions. Planned Parenthood of Southeastern Pennsylvania v. Casey, supra, 505 U.S. at 874, 877, 900-01, 112 S.Ct. 2791 (plurality opinion); Stenberg v. Carhart, 530 U.S. 914, 930, 938, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); cf. Mazurek v. Armstrong, 520 U.S. 968, 972-73, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam). The feebler the medical grounds, the likelier the burden, even if slight, to be “undue” in the sense of disproportionate or gratuitous. It is not a matter of the number of women likely to be affected. “[A]n undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.” Planned Parenthood of Southeastern Pennsylvania v. Casey, supra, 505 U.S. at 877, 112 S.Ct. 2791 (plurality opinion). In this case the medical grounds thus far presented (“thus far” being an important qualification given the procedural setting — a preliminary-injunction proceeding) are feeble, yet the burden great because of the state’s refusal to have permitted abortion providers a reasonable time within which to comply.
And so the district judge’s grant of the injunction must be upheld. But given the technical character of the evidence likely to figure in the trial — both evidence strictly medical and evidence statistical in character concerning the consequences both for the safety of abortions and the availability of abortion in Wisconsin — the district judge may want to reconsider appointing a neutral medical expert to testify at the trial, as authorized by Fed.R.Evid. 706, despite the parties’ earlier objections. Given the passions that swirl about abortion rights and their limitations there is a danger that party experts will have strong *799 biases, clouding their judgment. They will still be allowed to testify if they survive a Daubert challenge, but a court-appointed expert may help the judge to resolve the clash of the warring party experts. And the judge may be able to procure a genuine neutral expert simply by directing the party experts to confer and-agree on two or three qualified neutrals among whom the judge can choose with confidence in their competence and neutrality. If either side’s party experts stonewall in the negotiations for the compilation of the neutral list, the judge can take disciplinary action; we doubt that will be necessary.
We emphasize in conclusion that the trial on the merits may cast the facts we have recited, based as they are on the record (by no means slim, however, though entirely documentary) of the preliminary-injunction proceeding, in a different- light. That record — all we have — requires that the district judge’s grant of the preliminary injunction be, and it hereby is,
Affirmed.