In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1736

PLANNED PARENTHOOD OF WISCONSIN, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

BRAD D. SCHIMEL, Attorney General of Wisconsin, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cv-00465-wmc — **William M. Conley**, *Chief Judge*.

ARGUED OCTOBER 1, 2015 — DECIDED NOVEMBER 23, 2015

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. On July 5, 2013, the Governor of Wisconsin signed into law a statute that the Wisconsin legislature had passed the previous month. So far as relates to this appeal the statute prohibits a doctor, under threat of heavy penalties if he defies the prohibition, from performing an abortion (and in Wisconsin only doctors are allowed to perform abortions, Wis. Stat. § 940.15(5)) unless he has ad-

mitting privileges at a hospital no more than 30 miles from the clinic in which the abortion is performed. Wis. Stat. § 253.095(2).

A doctor granted admitting privileges by a hospital becomes a member of the hospital's staff and is authorized to admit patients to that hospital and to treat them there; that is the meaning of "admitting privileges." Of course any doctor (in fact any person) can bring a patient to an emergency room to be treated by the doctors employed there. A hospital that has an emergency room is obliged to admit and to treat a patient requiring emergency care even if the patient is uninsured. 42 U.S.C. § 1395dd(b)(1). Moreover, all Wisconsin abortion clinics are required by law (see Wis. Admin. Code Med. § 11.04(1)(g)) to have transfer agreements with local hospitals to streamline the process of transferring the patient from the abortion clinic to a nearby hospital, which could be important if the patient would be better served elsewhere in a hospital than the emergency room—though in that event the emergency room doctors would send her to the part of the hospital in which she could best be served.

Planned Parenthood of Wisconsin and Milwaukee Women's Medical Services (also known as Affiliated Medical Services, commonly referred to as AMS)—which operate the only four abortion clinics in Wisconsin—joined by two doctors employed by Planned Parenthood, filed suit on the day the governor signed the statute into law. The plaintiffs challenged the statute's constitutionality under 42 U.S.C. § 1983, which provides a tort remedy for violations of federal law by state officials or other state employees. The plaintiffs sought and obtained first a temporary restraining order and then a preliminary injunction against enforcement of the statute

(not the entire statute, just the provision regarding admitting privileges for abortion doctors—but for simplicity we'll generally call that provision "the statute").

The defendants (the Wisconsin attorney general, Wisconsin district attorneys, the Wisconsin Secretary of the Department of Safety and Professional Services, and members of the state's Medical Examining Board) appealed from the grant of the preliminary injunction. 28 U.S.C. § 1292(a)(1). We affirmed the grant in *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013). That cleared the way for the district judge to conduct a full trial, which he did. The trial culminated in his granting a permanent injunction against enforcement of the statute, which was the relief sought by the plaintiffs. The defendants (essentially, the state) have again appealed, arguing that the statute protects the health of women who experience complications from an abortion. The plaintiffs disagree, arguing that if allowed to go into effect the statute would not protect the health of women but would simply make it more difficult for them to obtain abortions, period, in violation of constitutional rights recognized by the U.S. Supreme Court.

There might appear to be a question about standing to sue, since the principal victims of the statute are women desiring abortions and none of them is a plaintiff. But we explained in our opinion upholding the preliminary injunction that the plaintiffs have standing. The cases are legion that allow an abortion provider, such as Planned Parenthood of Wisconsin or AMS, to sue to enjoin as violations of federal law (hence litigable under 42 U.S.C. § 1983) state laws that restrict abortion. These cases emphasize not the harm to the abortion clinic of making abortions very difficult to obtain

legally, though that might be an alternative ground for rec-ognizing a clinic's standing, but rather "the confidential na-ture of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without com-promising their privacy," as a result of which "the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients." *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013); see also Richard H. Fal-lon, Jr., "As-Applied and Facial Challenges and Third-Party Standing," 113 *Harv. L. Rev.* 1321, 1359–61 (2000).

A related consideration, important in this case as we'll see, is the heterogeneity of the class that is likely to be affect-ed by the Wisconsin statute. If one of the abortion clinics in the state closes, placing increased demand on the others, some women wanting an abortion will experience delay in obtaining, or may even be unable to obtain, an abortion, yet not realize that the new law is likely to have been the cause. Those women would be unlikely to sue. Other women might be able to find an abortion doctor who had admitting privi-leges at a nearby hospital, yet still incur costs and delay be-cause the law had reduced the number of doctors who are allowed to perform abortions. Suits to recover the costs, in-cluding some quantification of the cost of delay, would be awkward. A suit by clinics and doctors seeking injunctive relief is more feasible and if successful gives the women what they want. If the clinics and doctors win, the patients win.

And finally the Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (the companion case to *Roe v. Wade*, 410 U.S. 113 (1973)), that abortion doctors (remember that the

two individual plaintiffs in this case are doctors employed by abortion clinics) have first-party standing to challenge laws limiting abortion when, as in *Doe* and the present case as well, penalties for violation of the laws are visited on the doctors. Wis. Stat. §§ 253.095(3), (4); see *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 903–04, 909 (1992) (plurality opinion); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976); *Karlin v. Foust*, 188 F.3d 446, 456 n. 5 (7th Cir. 1999); *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998).

Although signed into law on a Friday (July 5, 2013), Wisconsin's statute required compliance—the possession, by every doctor who performs abortions, of admitting privileges at a hospital within a 30-mile radius of each clinic at which the doctor performs abortions—by the following Sunday (July 7, 2013). See Wis. Stat. §§ 253.095(2), 991.11. There was no way an abortion doctor, or any other type of doctor for that matter, could obtain admitting privileges so quickly, and there wouldn't have been a way even if the two days hadn't been weekend days. As the district court found, it takes a minimum of one to three months to obtain admitting privileges and often much longer. It took ten months for one of the individual plaintiffs to obtain admitting privileges. It took eight months for the other one to obtain admitting privileges at one hospital and nine months for her to obtain them at another hospital. Moreover, hospitals are permitted rather than required to grant such privileges, and some may be reluctant to grant admitting privileges to abortion doctors because there is great hostility to abortion in Wisconsin, though as we'll see hospitals have now granted such privileges to a number of the state's abortion doctors.

States that have passed laws similar to Wisconsin's have allowed *much* longer implementation time than a weekend—for example, Mississippi allowed 76 days from statutory approval date to effective date, Alabama 83 days, and Texas 103 days. 2012 Miss. Gen. Laws 331 (H.B. 1390), enjoined in *Jackson Women's Health Organization v. Currier*, 760 F.3d 448 (5th Cir. 2014); 2013 Ala. Legis. Serv. 2013-79 (H.B. 57), enjoined in *Planned Parenthood Southeast, Inc. v. Bentley*, 951 F. Supp. 2d 1280 (M.D. Ala. 2013); 2013 Tex. Sess. Law Serv. 2nd Called Sess. Ch. 1 (H.B. 2), upheld in *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583 (5th Cir. 2014). True, the statute had been passed by the Wisconsin legislature weeks rather than days before it took effect, but weeks aren't enough time in which to get admitting privileges, and until the governor signed the law there could be no certainty that it would become law; until then the abortion doctors would not know whether they'd be required to obtain such privileges.

As of July 7 none of the doctors at either the AMS clinic (in Milwaukee) or Planned Parenthood's Appleton clinic had admitting privileges at a hospital within the required 30-mile distance from the clinic, and neither did two of the doctors at Planned Parenthood's Milwaukee clinic. On the date of oral argument of the appeal from the grant of the preliminary injunction—almost five months after the law would have taken effect had it not been for that injunction and the temporary restraining order that preceded it—the application of one of the doctors for admitting privileges had been denied and none of the applications of the others had been granted. Had enforcement of the statute not been stayed, two of the state's four abortion clinics—the one in Appleton (the only one north of Milwaukee) and one of the Milwaukee

clinics—would have had to shut down because none of their doctors had admitting privileges at a hospital within the prescribed radius; and the capacity of a third clinic to perform abortions would have shrunk in half.

The state points out that abortion doctors have now had more than two years since the statute was enacted in which to obtain admitting privileges. But the legislature's intention to impose the two-day deadline, the effect of which would have been to force half the Wisconsin abortion clinics to close for months, is difficult to explain save as a method of preventing abortions that women have a constitutional right to obtain. The state tells us that "there is no evidence the [Wisconsin] Legislature knew AMS physicians would be unable to comply with the Act." That insults the legislators' intelligence. How *could* they have thought that an abortion doctor, or any doctor for that matter, could obtain admitting privileges in so short a time as allowed? The clinics would have had to close, and months would have passed before they could reopen.

The fixing of such a short deadline for obtaining admitting privileges, a deadline likely to deny many women the right to an abortion for a period of months while the abortion doctors tried to obtain those privileges, could be justified consistently with the Supreme Court's abortion jurisprudence only if there were reason to believe that the health of women who have abortions is endangered if their abortion doctors don't have admitting privileges. The district court correctly found that there is no reason to believe that. A woman who experiences complications from an abortion (either while still at the clinic where the abortion was performed or at home afterward) will go to the nearest hospital,

which will treat her regardless of whether her abortion doctor has admitting privileges. As pointed out in a brief filed by the American College of Obstetricians and Gynecologists, the American Medical Association, and the Wisconsin Medical Society, "it is accepted medical practice for hospital-based physicians to take over the care of a patient and whether the abortion provider has admitting privileges has no impact on the course of the patient's treatment." As Dr. Serdar Bulun, the expert witness appointed in this case by the district judge under Fed. R. Evid. 706, testified, the most important factor would not be admitting privileges, but whether there was a transfer agreement between the clinic and the hospital. As we've said, abortion doctors in Wisconsin are *required* to have such transfer agreements. See Wis. Admin. Code Med. § 11.04(1)(g). The treating doctor at the hospital probably would want to consult with the doctor who had performed the abortion, but for such a consultation the abortion doctor would not need admitting privileges.

As it happens, complications from an abortion are both rare and rarely dangerous—a fact that further attenuates the need for abortion doctors to have admitting privileges. Two studies cited in the amicus curiae brief filed by the American College of Obstetricians and Gynecologists et al. and credited by the district judge—Tracy A. Weitz et al., "Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver," 103 *Am. J. Public Health* 454, 457–58 (2013), and Kelly Cleland et al., "Significant Adverse Events and Outcomes After Medical Abortion," 121 *Obstetrics & Gynecology* 166, 169 (2013)—find that complications occur in only 1 out of 112 physician-performed first-trimester aspiration abortions (the most common type of

surgical abortion), and that 94 percent of those complications are "minor." Weitz et al., *supra*, at 457–58 tab. 2. For medical abortion (abortion by pill), the rate of complications is only 1 in 153. Cleland et al., *supra*, at 169 tab. 2. The official Wisconsin figure for 2013 is even lower: 1 complication per 404 abortions of all types. And finally only 1 in 1937 physician-conducted aspiration abortions result in major complications (a category which includes hospital admissions), and 1 in 1732 medical abortions require hospital admission. Weitz et al., *supra*, at 456, 458–59; Cleland et al., *supra*, at 169 tab. 2.

These studies have found that the rate of complications is below 1 percent; in the case of complications requiring hospital admissions it is one-twentieth of 1 percent. The rate of complications for second-trimester surgical abortions is slightly higher—1.3 percent. Anna C. Frick et al., "Effect of Prior Cesarean Delivery on Risk of Second-Trimester Surgical Abortion Complications," 115 *Obstetrics & Gynecology* 760 (2010). In the five-year period 2009 to 2013, only 12 women who had abortions at clinics in Wisconsin experienced complications requiring transfer from clinic to hospital. Fifteen additional women who had received abortions at a Planned Parenthood clinic and left the clinic without apparent complications later sought treatment at a hospital. The record does not contain a comparable figure for the AMS clinic. There is no evidence that any of these women received inadequate hospital care because the doctors who had performed their abortions lacked admitting privileges.

One doctor with extensive experience in obstetrics and gynecology told about a case in which a woman with a complication from an abortion might, he thought, have avoided a hysterectomy if her abortion doctor had called the hospital

or had had admitting privileges. That is the only evidence in the record that any woman whose abortion resulted in a medical complication has *ever*, anywhere in the United States, been made worse off by being handed over by her abortion doctor to a gynecologist, or other specialist with relevant expertise, employed by the hospital to which she's taken. And the example doesn't actually have anything to do with admitting privileges. The abortion doctor didn't need admitting privileges at a hospital in order to call an ambulance to take his patient to the nearest hospital, or to communicate with the treating doctor at the hospital—neither of which he did. As the district judge found, in the case of abortion "any benefit of admitting privileges in terms of continuity of care is incrementally small."

And as noted, Wisconsin abortion clinics—uniquely, it appears, among outpatient providers of medical services in Wisconsin—are required by law to adopt transfer protocols intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization. See Wis. Admin. Code Med. § 11.04(1)(g).

The state presented no other evidence of complications from abortions in Wisconsin that were not handled adequately by the hospitals in the state. And no documentation of a medical need for requiring abortion doctors to obtain admitting privileges had been presented to the Wisconsin legislature when it was deliberating on the bill that became the statute challenged in this case. The only medical evidence that had been submitted to the legislature had come from a doctor representing the Wisconsin Medical Society— and she opposed requiring that abortion doctors obtain ad-

mitting privileges. The only testimony presented to the legislature that admitting privileges are important to continuity of care was presented by a representative of Wisconsin Right to Life who happens not to be a doctor. Indeed the legislative deliberations virtually ignored the provision concerning admitting privileges, focusing instead on another provision—a requirement not challenged in this suit that a woman seeking an abortion obtain an ultrasound examination of her uterus first (if she hadn't done so already), which might induce her to change her mind about having an abortion. Wis. Stat. § 253.10(3)(c)(1)(gm).

No other procedure performed outside a hospital, even one as invasive as a surgical abortion, is required by Wisconsin law to be performed by doctors who have admitting privileges at hospitals within a specified radius of where the procedure is performed. And that is the case even for procedures performed when the patient is under general anesthesia, and even though more than a quarter of all surgical operations in the United States are now performed outside of hospitals. Karen A. Cullen et al., "Ambulatory Surgery in the United States, 2006," *Centers for Disease Control and Prevention: National Health Statistics Reports* No. 11, Sept. 4, 2009, p. 5, www.cdc.gov/nchs/data/nhsr/nhsr011.pdf (visited Nov. 21, 2015, as was the other website cited in this opinion). And that is true even for such gynecological procedures as diagnostic dilation and curettage (D&C) (removal of tissue from the inside of the uterus), hysteroscopy (endoscopy of the uterus), and surgical completion of miscarriage (surgical removal of fetal tissue remaining in the uterus after a miscarriage, which is a spontaneous abortion rather than one medically induced)—procedures medically similar to abortion.

Dr. John Thorp, Jr., an expert witness for the defendants, testified that abortion is more dangerous than D&C or hysteroscopy because there is increased blood flow during a pregnancy. But one of the plaintiffs' experts, Dr. Douglas Laube, countered that a pregnant uterus responds better to treatments to stop bleeding, making the risk of the procedures roughly the same. The district judge was entitled to credit Laube's testimony over Thorp's, and credit too the studies placed in evidence that showed how rare major complications of both hysteroscopy and second-trimester surgical abortion are. See Morris Wortman et al., "Operative Hysteroscopy in an Office-Based Surgical Setting: Review of Patient Safety and Satisfaction in 414 Cases," 20 *J. Minimally Invasive Gynecology* 56 (2013); T. C. van Kerkvoorde et al., "Long-term Complications of Office Hysteroscopy: Analysis of 1028 Cases," 19 *id*. 494 (2012); Frick et al., *supra*.

Dr. Thorp acknowledged, moreover, that admitting privileges are no more important for abortions than for other outpatient procedures. Yet Wisconsin appears to be indifferent to complications of any other outpatient procedures, even when they are far more likely to produce complications than abortions are. For example, the rate of complications resulting in hospitalization from colonoscopies done for screening purposes is four times the rate of complications requiring hospitalization from first-trimester abortions. See Cynthia W. Ko et al., "Serious Complications Within 30 Days of Screening and Surveillance Colonoscopy Are Uncommon," 8 *Clinical Gastroenterology & Hepatology* 166, 171–72 (2010). Operative colonoscopy has an even higher rate of major complications, making it riskier than even second-trimester abortions. See Jerome D. Waye et al., "Colonoscopy: A Prospective Report of Complications," 15 *J. Clinical*

*Gastroenterology* 347 (1992). It is conceivable that because of widespread disapproval of abortion, abortions and their complications may be underreported—some women who experience them and are hospitalized may tell the hospital staff that the complications are from a miscarriage. But there is no evidence of significant or widespread underreporting.

The defendants argue that obtaining admitting privileges operates as a kind of Good Housekeeping Seal of Approval for a doctor. True; but obtaining the seal does not require that the hospital in which the doctor obtains the privileges be within 30 miles of his clinic. See, e.g., *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377, 1378–81 (8th Cir. 1989). Several abortion doctors in Wisconsin who lack admitting privileges at hospitals within the prescribed radius have them—their Good Housekeeping Seals of Approval—at more distant hospitals from their clinic yet are not excused by the statute from having to obtain the identical privileges from a hospital within the 30-mile radius.

The defendants argue that admitting privileges improve continuity of care. But nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion. He doesn't have to accompany her to the hospital, treat her there, visit her, call her, etc. The statute also does not distinguish between surgical and medical abortions. The latter term refers to an abortion induced by pills given to the patient by her doctor: she takes one pill in the clinic, goes home, and takes an additional pill or pills one or two days later to complete the procedure. Her home may be far from any hospital that is within 30 miles of her doctor's clinic, but close to a hospital farther from the clinic. If she calls an ambulance the par-

amedics are likely to take her to the nearest hospital—a hospital at which her abortion doctor is unlikely to have admitting privileges. Likewise in the case of surgical abortions when complications occur not at the clinic during or immediately after the abortion but after the patient has returned home. Because of distance, she may lack ready access to hospitals near the clinic at which the abortion was performed. She may live near a hospital, but not a hospital at which the doctor who performed her abortion has admitting privileges.

We can imagine an argument that what Wisconsin did in this case was to make the regulation of the treatment of abortion complications simply the first step on the path to a regulation of all potentially serious complications. But the defendants have not argued this; nor is it plausible that the state would begin such an effort with a procedure that has a very low rate of serious complications. The statute has been on the books for more than two years, yet there is no indication that the legislature has given any consideration to requiring admitting privileges for any doctors other than abortion providers.

The district judge had remarked in granting the preliminary injunction that while he would "await trial on the issue, … the complete absence of an admitting privileges requirement for [other] clinical [i.e., outpatient] procedures including for those with greater risk [than abortion] is certainly evidence that [the] Wisconsin Legislature's only *purpose* in its enactment was to restrict the availability of safe, legal abortion in this State, particularly given the lack of any demonstrable medical benefit for its requirement either presented to the Legislature or [to] this court." *Planned Parenthood of*

*Wisconsin, Inc. v. Van Hollen*, No. 13–cv–465–wmc, 2013 WL 3989238, at *10 n. 26 (W.D. Wis. Aug. 2, 2013) (emphasis in original). Confirmatory evidence is the statutory two-day deadline for obtaining admitting privileges in order to be allowed to perform abortions, though that deadline is of course no longer operable. And we can't forbear to mention the weird private civil remedy for violations: The father, or a grandparent, of the "aborted unborn child" is entitled to obtain damages, including for emotional and psychological distress, if the abortion was performed by a doctor who lacked admitting privileges. Wis. Stat. § 253.095(4)(a). Were the law aimed at protecting the mother's health, as the state contends, a violation of the law could harm the fetus's father or grandparent only if the mother were injured physically or psychologically as a result of her abortion doctor's lacking the required admitting privileges. But the statute requires no proof of *any* injury of *any* kind to the mother to entitle the father or grandparent to damages upon proof of a violation of the statute. Wis. Stat. § 253.095(4).

Until and unless *Roe v. Wade* is overruled by the Supreme Court, a statute likely to restrict access to abortion with no offsetting medical benefit cannot be held to be within the enacting state's constitutional authority. The courts have "an independent constitutional duty to review [a legislature's] factual findings where constitutional rights are at stake." *Gonzales v. Carhart*, 550 U.S. 124, 163–65 (2007). The Wisconsin statute does not "further[] the legitimate interest" of the state in advancing women's health, and it was not "reasonable for [the legislature] to think" that it would. *Id*. at 146, 160.

Were it not for the injunctions issued by the district court (and the temporary restraining order that preceded them),

the statute would have substantially curtailed the availability of abortion in Wisconsin, without conferring an offsetting benefit (or indeed any benefit) on women's health. Virtually all abortions in Wisconsin are performed at the four abortion clinics (the three Planned Parenthood clinics and the AMS clinic); no other clinics perform abortions, and hospitals perform only a small fraction of the abortions performed in the state. With the preliminary and now the permanent injunction having lifted the deadline for obtaining admitting privileges, doctors at the three Planned Parenthood abortion clinics (Milwaukee, Madison, and Appleton) have been able to obtain admitting privileges at nearby hospitals. But the two doctors at the fourth clinic, AMS, have been unable to obtain such privileges at any hospital even though 17 hospitals are within a 30-mile radius of the clinic.

Not that its doctors haven't tried to obtain the privileges. The district court found credible their testimony that the chances of their being granted admitting privileges are "slim to none." The reason is that almost all of their practice consists of performing abortions and they therefore lack recent experience in performing inpatient medical procedures for which hospitals would grant admitting privileges. Nor is any of their clinical practice peer reviewed, which hospitals also make a condition of granting admitting privileges. One of the doctors couldn't even obtain an *application* for admitting privileges at Aurora-Sinai Hospital, because he couldn't show that he'd "treated patients in a hospital or appropriate outpatient setting in which the Practitioner's care was subject to evaluation through peer review acceptable to the Metro Credentials Committee, in the previous twelve (12) months." Froedtert Hospital likewise rejected his application, because he provided neither "evidence of recent (with-

in the past 2 years) inpatient activity" nor "an evaluation of [his] ability to provide care for patients in the inpatient environment." The other AMS doctor was also rejected by Aurora-Sinai, which told him he was ineligible to obtain full admitting privileges because he would be unable to admit the required minimum of 20 patients per year, and that he could not obtain courtesy privileges (which differ from full privileges in allowing a doctor to admit only a very few patients) without already having staff privileges at another hospital. Another hospital, St. Joseph's Community Hospital of West Bend, requires applicants for obstetrics/gynecology admitting privileges to have delivered 100 babies in the previous two years, by which of course they mean live babies; and delivering live babies is not what abortion doctors do.

Moreover, all the hospitals require, as a condition to obtaining admitting privileges, demonstrated competence in performing the particular procedures that the doctor seeks to perform at the hospital on patients that he admits. Although a defense expert from Columbia St. Mary's Hospital testified that the hospital would evaluate a physician's quality without requiring a record of inpatient care, he acknowledged that a doctor seeking admitting privileges would have to demonstrate competence to perform the specific procedures for which he sought the privileges. Hospitals are entitled to demand proof that doctors seeking to work at the hospital be able to perform the procedures that they want to perform there. But to condition the grant of admitting privileges on being qualified to perform procedures that AMS's abortion doctors never perform is to bar them from performing abortions.

So, as the district judge found, if the statute is valid neither of the AMS doctors will be allowed to perform any abortions, and the clinic will have to shut down unless it can recruit and retain other doctors—doctors who have or can readily obtain admitting privileges within the prescribed radius of the clinic. But it is difficult to hire such doctors, not only because it's difficult for abortion doctors to obtain admitting privileges (especially within a prescribed radius of the clinic) but also because of the vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states, such as Wisconsin, in which there is intense opposition to abortion.

AMS is particularly vulnerable because, as we're about to see, it's the only abortion clinic in the state that performs late-term abortions. But were the statute to be upheld, Planned Parenthood's clinics could also face having to close or significantly reduce the abortions they perform, within a few years, despite currently having doctors with admitting privileges. Hospitals generally require that a doctor, to maintain his admitting privileges, be responsible for admitting a specified minimum number of patients annually. Because of the very low rate of complications from abortions that require hospitalization, the required quotas may be difficult to meet.

One might think (setting that last point to one side for the moment) that the Planned Parenthood abortion clinic in Milwaukee would have adequate capacity to serve all women in the Milwaukee area who decide to have an abortion, in which event the demise of AMS would be no big deal. Not so. Of some 6462 abortions performed in Wisconsin in 2013 (the latest year for which there are complete figures), 5800

were performed in abortion clinics in the state (see Wisconsin Department of Health Services, "Reported Induced Abortions in Wisconsin, 2013," Aug. 2014, www.dhs.wisconsin.gov/publications/p4/p45360-13.pdf), and 2500 of those were performed by AMS. (Presumably the 662 abortions not performed in abortion clinics were performed in hospitals.)

The Planned Parenthood clinic in Milwaukee would have to expand staff and facilities to accommodate such an influx (the Planned Parenthood clinic in Appleton is more than a hundred miles from Milwaukee, and the Madison clinic eighty miles, distances that would impose hardship on some women who live close to Milwaukee and are seeking abortions), and this would be costly and could even be impossible given the difficulty of recruiting abortion doctors. The district judge accepted uncontradicted testimony that Planned Parenthood could not absorb the additional demand for abortions, and the result (of demand exceeding supply) would be an 8 to 10 week delay in obtaining an abortion. Some women would have to forgo first-trimester abortions and instead get second-trimester ones, which are more expensive and present greater health risks. Other women would be unable to obtain any abortion, because the delay would push them past the 18.6-weeks-LMP ("last menstrual period," which is likely to precede conception by a couple of weeks) deadline for the Planned Parenthood clinics' willingness to perform abortions. Only AMS will perform abortions beyond that limit (up to 22 and occasionally 24 weeks of pregnancy). Women seeking lawful abortions that late in their pregnancy, either because of the waiting list or because they hadn't realized their need for an abortion sooner, would be unable to obtain abortions in Wisconsin.

AMS performs about 250 late-term abortions each year (and that's without the additional patients who would be pushed past 18.6 weeks by an 8 to 10 week waiting list). And, to repeat, it's the only abortion clinic in Wisconsin that performs such abortions. Although the state points out that these late-term abortions currently constitute fewer than one percent of the abortions performed in the state, "the analysis does not end with the one percent of women upon whom the statute operates; it begins there." *Planned Parenthood of Southeastern Pennsylvania v. Casey*, *supra*, 505 U.S. at 894 (plurality opinion). For the longer the waiting list for an abortion, the more women who want to have early-term abortions will perforce end up having late-term ones, which are more dangerous.

No problem, argues the state, since Chicago is only 90 miles from Milwaukee, and there is at least one clinic in Chicago that will perform abortions after 19 weeks. The logic of the state's position is that it could forbid both abortion clinics in Milwaukee to perform abortions on anyone living in that city, given that the Chicago clinics are only about 90 miles away (and one clinic, in the northern suburbs of Chicago, is only 74 miles from Milwaukee's city center).

The state's position is untenable. As we said in *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011), the proposition that

> the harm to a constitutional right [can be] measured by the extent to which it can be exercised in another jurisdiction … [is] a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that

it may be exercised in some other place." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76–77 (1981), quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the ground that those rights may be freely enjoyed in the suburbs.

Or as the Supreme Court put it in *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938),

> the obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities—each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do.

See also *Jackson Women's Health Organization v. Currier*, *supra*, 760 F.3d at 457–58. It's true that we said in *A Woman's Choice–East Side Women's Clinic v. Newman*, 305 F.3d 684, 688 (7th Cir. 2002), that the undue burden standard should be applied "to the nation as a whole, rather than one state at a time." But the statement, though in seeming tension with *Gaines* and *Jackson*, has nothing to do with looking at the availability of abortion services across state lines. Instead the court was worried that district judges in different states might reach different conclusions about the constitutionality of nearly identical statutes.

It's also true, though according to the cases just quoted irrelevant, that a 90-mile trip is no big deal for persons who own a car or can afford an Amtrak or Greyhound ticket. But more than 50 percent of Wisconsin women seeking abortions have incomes below the federal poverty line and many of them live in Milwaukee (and some north or west of that city and so even farther away from Chicago). For them a round trip to Chicago, and finding a place to stay overnight in Chicago should they not feel up to an immediate return to Wisconsin after the abortion, may be prohibitively expensive. The State of Wisconsin is not offering to pick up the tab, or any part of it. These women may also be unable to take the time required for the round trip away from their work or the care of their children. The evidence at trial, credited by the district judge, was that 18 to 24 percent of women who would need to travel to Chicago or the surrounding area for an abortion would be unable to make the trip.

An abortion-restricting statute sought to be justified on medical grounds requires not only reason to believe (here lacking, as we have seen) that the medical grounds are valid, but also reason to believe that the restrictions are not disproportionate, in their effect on the right to an abortion, to the medical benefits that the restrictions are believed to confer and so do not impose an "undue burden" on women seeking abortions. See *Planned Parenthood of Southeastern Pennsylvania v. Casey*, *supra*, 505 U.S. at 874, 877, 900–01 (plurality opinion); *Gonzales v. Carhart*, *supra*, 550 U.S. at 146, 157–58; *Stenberg v. Carhart*, 530 U.S. 914, 930, 938 (2000). To determine whether the burden imposed by the statute is "undue" (excessive), the court must "weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's

interests. If a burden significantly exceeds what is necessary to advance the state's interests, it is 'undue,'" *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 913 (9th Cir. 2014), which is to say unconstitutional. The feebler the medical grounds (in this case, they are nonexistent), the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive.

There are those who would criminalize all abortions, thus terminating the constitutional right asserted in *Roe* and *Casey* and a multitude of other decisions. And there are those who would criminalize all abortions except ones that terminate a pregnancy caused by rape or are necessary to protect the life or (in some versions) the health of the pregnant woman. But what makes no sense is to abridge the constitutional right to an abortion on the basis of spurious contentions regarding women's health—and the abridgment challenged in this case would actually endanger women's health. It would do that by reducing the number of abortion doctors in Wisconsin, thereby increasing the waiting time for obtaining an abortion, and that increase would in turn compel some women to defer abortion to the second trimester of their pregnancy—which the studies we cited earlier find to be riskier than a first-trimester abortion. For abortions performed in the first trimester the rate of major complications is 0.05-0.06 percent (that is, between five one-hundredths of 1 percent and six one-hundredths of 1 percent). It is 1.3 percent for second-trimester abortions—between 22 and 26 times higher.

The burden on abortion imposed by the Wisconsin statute is greater than in the cases in which the Fourth and Fifth Circuits have upheld similar admitting privileges require-

ments, because the plaintiffs in those cases failed to satisfy the courts that the challenged statutes would lead to a substantial decline in the availability of abortion. In both *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, *supra*, 748 F.3d at 597–98, and *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 162, 170 (4th Cir. 2000), the courts decided that the evidence compelled only a conclusion that one clinic in each state would close as a result of the statute and each of those two clinics performed only a small proportion of its state's abortions.

The Fifth Circuit also upheld another requirement in the same statute—that abortion clinics must meet the standards for ambulatory surgical centers—despite the evidence that as a result of this requirement only eight clinics would survive out of the more than forty in existence when the statute was enacted. *Whole Woman's Health v. Cole*, 790 F.3d 563, 578 (5th Cir. 2015), cert. granted, 2015 WL 5176368 (Nov. 13, 2015). The court remarked the absence of evidence that the remaining clinics could not expand their capacity to compensate for the closing of more than three-fourths of them, *id.* at 590, although one wouldn't think it necessary to parade evidence that the remaining clinics would find it extremely difficult to quadruple their capacity to provide abortions, which would require, in the face of fierce opposition to abortion clinics and the difficulty of relocating abortion doctors from the closed clinics, extensive physical enlargement to house additional patients and doctors.

A great many Americans, including a number of judges, legislators, governors, and civil servants, are passionately opposed to abortion—as they are entitled to be. But persons who have a sophisticated understanding of the law and of

the Supreme Court know that convincing the Court to over-rule *Roe v. Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey* is a steep uphill fight, and so some of them proceed indirectly, seeking to discourage abortions by making it more difficult for women to obtain them. They may do this in the name of protecting the health of women who have abortions, yet as in this case the specific measures they support may do little or nothing for health, but rather strew impediments to abortion. This is true of the Texas requirement, upheld by the Fifth Circuit in the *Whole Woman's* case now before the Supreme Court, that abortion clinics meet the standards for ambulatory surgical centers—a requirement that if upheld will permit only 8 of Texas's abortion clinics to remain open, out of more than 40 that existed when the law was passed. And comparably in our case the requirement of admitting privileges cannot be taken seriously as a measure to improve women's health because the transfer agreements that abortion clinics make with hospitals, plus the ability to summon an ambulance by a phone call, assure the access of such women to a nearby hospital in the event of a medical emergency.

Opponents of abortion reveal their true objectives when they procure legislation limited to a medical procedure—abortion—that rarely produces a medical emergency. A number of other medical procedures are far more dangerous to the patient than abortion, yet their providers are not required to obtain admitting privileges anywhere, let alone within 30 miles of where the procedure is performed. Nor is it likely to have been an accident that the Wisconsin legislature, by making its law requiring admitting privileges effective immediately, would have prevented most of the abortion doctors in the state from performing any abortions for

months (for it usually takes months to obtain admitting privileges) had the district court not issued a temporary restraining order followed immediately by a preliminary injunction.

In *Planned Parenthood of Greater Texas* the court excoriated our opinion upholding the preliminary injunction in the present case, on the ground that we had insisted on *evidence* that requiring abortion doctors to have admitting privileges would improve women's health. 748 F.3d at 596. The Fifth Circuit said that the "first step in the analysis of an abortion regulation … is *rational* basis review, not *empirical* basis review." *Id*. (emphases in original). Indeed it said "there is 'never a role for evidentiary proceedings' under rational basis review." *Id.* We take that to be a reference to the motive for "rational basis" review of state laws—namely a reluctance by the federal judiciary to invalidate state laws that even if difficult to defend or explain by reference to sound public policy do not cause harm serious enough to be classified as depriving persons of life, liberty, or property, however broadly those terms are understood.

But a statute that curtails the constitutional right to an abortion, such as the Wisconsin and Texas statutes, cannot survive challenge without evidence that the curtailment is justifiable by reference to the benefits conferred by the statute. The statute may not be irrational, yet may still impose an undue burden—a burden excessive in relation to the aims of the statute and the benefits likely to be conferred by it—and if so it is unconstitutional.

The evidence of benefits that was presented to the Texas legislature and discussed by the Fifth Circuit was weak; in our case it's nonexistent. The principal witness for the State of Wisconsin, Dr. Thorp, mentioned earlier, testified that the

death rate for women who undergo abortions is the same as for other pregnant women. But he could not substantiate that proposition and admitted that both rates are very low. His expert report states that there are "increased risks of death for women electing [abortion] compared to child-birth," but the studies he cited measured long-term mortality rates rather than death resulting from an abortion, and also failed to control for socioeconomic status, marital status, or a variety of other factors relevant to longevity. See David Reardon & Priscilla Coleman, "Short and Long Term Mortality Rates Associated with First Pregnancy Outcome: Population Register Based Study for Denmark 1980–2004," 18 *Medical Science Monitor* PH71, PH75 (2012); Coleman et al., "Reproductive History Patterns and Long-Term Mortality Rates: A Danish, Population-Based Record Linkage Study," 23 *European J. Public Health* 569, 569, 573 (2012). In contrast, the plaintiffs' expert Dr. Laube tendered a more apt study which concluded that the risk of death associated with childbirth is 14 times *higher* than that associated with abortion. See Elizabeth G. Raymond & David A. Grimes, "The Comparative Safety of Legal Induced Abortion and Childbirth in the United States," 119 *Obstetrics & Gynecology* 215 (Feb. 2012).

Dr. Thorp acknowledged that the number of abortion providers is declining, but attributed this (again without substantiation) not to harassment but to our society's "progressing in its recognition of what constitutes human life." And he agreed as we noted earlier that admitting privileges are no more necessary for abortion than for other outpatient surgical procedures. Neither Thorp nor any other witness for the defendants was able to cite a case in which a woman who had a complication from an abortion wasn't properly treated for it because her abortion doctor lacked admitting

privileges. The evidence was heavily weighted against the defendants. We do not agree with the Fifth Circuit that evidence is irrelevant in a constitutional case concerning abortion.

The state insists that the plaintiffs' medical expert and the neutral expert agreed with it that admitting privileges would be a good thing for abortion doctors to have. But a fair interpretation of their testimony is that a doctor's admitting privileges are of value to a patient because they suggest that the hospital that has granted them thinks well of the doctor and because he may be able to expedite the admission of a patient who needs hospital care to the hospital in which the doctor has those privileges. These witnesses did not testify that an abortion doctor who lacks admitting privileges is a danger to his patients. The neutral expert, Dr. Bulun, said that privileges could have advantages, but he was comparing a doctor with privileges to one without privileges; he was not asked whether a shortage of abortion doctors, though such abortion doctors as there were all had privileges, would be preferable to there being enough abortion doctors but not all with admitting privileges. He added that "if there's a well-established procedure for a transfer agreement, in my mind that would be the most important factor to ensure good quality of care." There is no evidence that transfer agreements provide inferior protection to the health of women undergoing abortion compared to admitting privileges. When the transfer agreements *and* the availability of emergency-room care *and* the rarity of complications of abortion that require hospitalization are compared to the impact this statute would have on access to abortion in Wisconsin, it is apparent that the defendants have failed to make a dent in

the district court's opinion granting the permanent injunction sought by the plaintiffs.

AFFIRMED

MANION, *Circuit Judge*, dissenting.

In June 2013, the Wisconsin legislature introduced a statute requiring abortion doctors to have admitting privileges at a nearby hospital. The statute was signed into law the following month, and the plaintiffs obtained a preliminary injunction from the district court, which we affirmed. *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013). The district court then granted a permanent injunction on the merits, finding that the admitting-privileges requirement unconstitutionally infringed on a woman's right to abortion. *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949 (W.D. Wis. 2015). Relying on the novel legal standard crafted by the majority in *Van Hollen*, the district court reached this result by shifting the burden onto the state to adduce empirical evidence justifying the rationality of its regulation. *Id.* at 962–64. This was error. Under well-established Supreme Court precedent, the state may constitutionally regulate abortion so long as it has a rational basis to act and does not impose an undue burden. *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007). Because Wisconsin's admitting-privileges requirement satisfies this standard, I dissent.

## I

Between 2009 and 2013, at least nineteen women who sought abortions at Planned Parenthood clinics in Wisconsin subsequently received hospital treatment for abortion-related complications.[1] Surely, no reasonable patient considering a

---

[1] *See* Dkt. 198 ¶ 11. The record also reveals that, during that period, at least four patients who received abortions at those clinics were transferred from the clinics to a hospital by ambulance for abortion-related complications, and four women reported that they had post-abortion infections that

medical procedure known to result in complications—potentially even death—would regard state measures designed to minimize those risks as an imposition on her constitutional rights. After all, patients are *more likely* to undergo medical procedures when they know that discrete measures have been taken by the state to reduce the likelihood of harm. Recognizing these basic facts, the four other federal appellate circuits that have examined similar admitting-privilege requirements have found or assumed a rational basis for them. This is such common sense that it would scarcely warrant mention in any other context. But this case involves abortion, so all bets are off.

Safety is not a negligible concern in any field of healthcare. Abortion—which is subject to less regulatory oversight than almost any other area of medicine—bears no exception. When we first reviewed Wisconsin's admitting-privileges requirement, my concurrence cited numerous examples of egregious "abortion care" in states across the nation. One article detailed the practices at former abortionist Kermit Gosnell's clinic in Pennsylvania, which included unlicensed personnel conducting gynecological examinations and administering painkillers. These practices resulted in the death of a patient named Karnamaya Mongar, who died after being given an overdose of anesthesia and pain medication. Media reports also circu-

resulted in treatment at a hospital. *Id.* ¶¶ 12–13. Additionally, between 2009 and 2014, at least eight AMS abortion patients were transferred directly from AMS's abortion clinic to a hospital to treat serious complications from an abortion procedure performed by one of AMS's physicians. *Id.* ¶ 26. During that same time period, at least three AMS abortion patients suffered complications serious enough that a hysterectomy was required, resulting in those patients no longer being able to bear children. *Id.* ¶ 27.

lated that Dr. Gosnell physically assaulted and performed a forced abortion on a minor and left fetal remains in a woman's uterus, causing her excruciating pain.

Dr. Gosnell was ultimately convicted of murder for the deaths of three infants delivered alive but subsequently killed at his clinic. In light of the nationwide attention that Dr. Gosnell's shop of horrors attracted, the Wisconsin State Assembly acted swiftly to pass Act 37, including the admitting-privileges requirement at issue, in order to protect the health and safety of pregnant women who have chosen an abortion. This lawsuit followed.

Dr. Gosnell was able to run his operation in a regulatory vacuum derived in no small part from the view held by some that any regulation upon his practice was a threat to the constitutional rights of his patients. Although we have recognized that doctors may bring suit on behalf of their abortion patients, it does not automatically follow that doctors and patients have identical interests. The constitutional right to privacy exists across the spectrum of medical procedures, yet in no other area of medicine may a doctor bring a suit on behalf of a patient solely because the doctor finds a safety regulation cumbersome. Where state regulation imposes on doctors measures designed to improve patient safety, doctor-patient interests may diverge. Because that is precisely the case in this instance, we must look to the regulation's effect on the prospective patient, not to the inconvenience the regulation presents to the abortionist.

Rather than shift the burden to the state to provide reasons it was justified to enact the law at issue, we are obligated to uphold a law that regulates abortion where there is a rational basis to act so long as the law does not have the effect of

imposing an undue burden on a woman's ability to make the decision to choose abortion. Here, the court sets this burden of proof exactly backwards. Because Wisconsin's admitting-privileges requirement protects the health and safety of pregnant women and does not constitute an undue burden under *Casey*, I would join the Fifth Circuit's merits decision in *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583 (5th Cir. 2014), *reh'g en banc denied*, 769 F.3d 330 (5th Cir. 2014) (*Abbott II*), which upheld a functionally identical law on similar facts. All of these facts lead me to the conclusion that the judgment of the district court should be reversed. For the reasons that follow, I dissent.

## II

### A. Wisconsin has a Rational Basis to protect the health and safety of pregnant women seeking an abortion.

The Supreme Court's surviving abortion cases have repeatedly affirmed that the state has a substantial interest in regulating abortion in furtherance of its interests in promoting the health and safety of pregnant women. *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 158, 163 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 931 (2000); *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (per curiam); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 878 (1992) (plurality); *Roe v. Wade*, 410 U.S. 113, 150, 163 (1973). So have ours. *See, e.g., Karlin v. Foust*, 188 F.3d 446, 478 (7th Cir. 1999); *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 467 (7th Cir. 1998).

Although the court purports to be consistent with these cases, in reality, its decision undermines the state's interest recognized within them. By doing so, the court sets a dangerous precedent that jeopardizes the ability of states to enact

laws designed to curb risks to the safety and welfare of patients who choose to undergo invasive medical procedures—including the women whom this admitting-privileges law protects. A brief reminder of the Supreme Court's repeated emphasis on the state's interest in protecting the health and safety of pregnant women who have chosen abortion is apparently necessary.

### B.  The Supreme Court's abortion decisions

In *Roe*, the Court recognized that a state has a "legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." *Roe*, 410 U.S. at 150. The Court concluded that the state's legitimate interest in regulating abortion to protect maternal health "obviously extends at least to [regulating] the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that may arise." *Id. Roe* left no doubt that the state "may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." *Id.* at 163.

In *Casey*, the Court abandoned *Roe*'s rigid trimester framework. *Casey*, 505 U.S. at 872–76. But not before reiterating that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Id.* at 846. Further, the Court added that, "[a]s with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion." *Id.* at 878.

Five years later, in *Mazurek*, the Court rejected a challenge

brought by abortion providers to a state law that restricted the provision of abortions only to licensed physicians. *Mazurek*, 520 U.S. at 976. By so ruling, the Court recalled that its "cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals." *Id.* at 973 (citation omitted).

Shortly thereafter, in *Stenberg*, the Court underscored *Roe* and *Casey*'s commitment to the health and safety of pregnant women by striking down a federal law that made partial-birth abortion illegal because it failed to contain a "health exception . . . 'for the preservation of the life or health of the mother.'" *Stenberg*, 530 U.S. at 938 (citation omitted). In laying the foundation for its decision, the Court first recalled that it has "repeatedly invalidated statutes that in the process of regulating the methods of abortion, imposed significant health risks." *Id.* at 931 (emphasis omitted). Channeling *Casey*, the Court then summarized the state's interest in the health of pregnant women as follows: "'where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother,' [] this Court has made clear that a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Id.* (citations omitted).

Most recently, in *Gonzales*, the Court consolidated these principles, acknowledging that "[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power" to regulate abortion. *Gonzales* 550 U.S. at 158. *Gonzales* held that state and federal lawmakers have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Id.* at 163 (citations omitted). In short, over four decades of Supreme Court decisions establish that the state has a legitimate interest in

promoting the health and safety of pregnant women seeking an abortion.

**C. The court splits with four federal appellate circuits.**

Mindful of the health and safety interests recognized in these decisions, Wisconsin and eleven other states have passed admitting-privilege laws. *Planned Parenthood of Wis. v. Van Hollen*, 738 F.3d 786, 791 (7th Cir. 2013). Lawsuits initiated by abortion providers followed, and multiple circuits have ruled on their constitutionality. The rationales deployed in these decisions have varied, but two facts are common throughout. First, every circuit to rule on similar admitting-privileges laws like the one at issue here has uniformly upheld them. Second, no circuit except ours has ventured anywhere close to adopting the extreme position taken by the court that a state's admitting-privileges law lacks a rational basis. *See Whole Women's Health v. Cole*, 790 F.3d 563, 584 (5th Cir. 2015) (plaintiffs challenging Texas's admitting-privileges law concede it is supported by a rational basis); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 454 (5th Cir. 2014) ("H.B. 1390 satisfies rational basis review based upon our binding precedent in *Abbott*."); *Planned Parenthood of Ariz., Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014) ("We assume without deciding that the Arizona law passes rational-basis review."); *Abbott II*, 748 F.3d at 595 ("Applying the rational basis test correctly, we have to conclude that the State acted within its prerogative to regulate the medical profession by heeding these patient-centered concerns and requiring abortion practitioners to obtain admitting privileges at a nearby hospital."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 411 (5th Cir. 2013) (*Abbott I*) ("The State offered more than a conceivable state of facts that could provide a rational basis for requiring

abortion physicians to have hospital admission privileges.")
(footnote and internal marks omitted); *Greenville Women's
Clinic v. Comm'r, S.C. Dep't of Health & Envtl. Control*, 317 F.3d
357, 363 (4th Cir. 2002) ("These requirements of having
admitting privileges at local hospitals and referral arrange-
ments with local experts are so obviously beneficial to
patients.") (citations omitted); *Women's Health Ctr. of W. Cty.,
Inc. v. Webster*, 871 F.2d 1377, 1381 (8th Cir. 1989) ("We have no
difficulty in concluding that [the admitting-privileges law]
rationally relates to the state's legitimate interest in ensuring
that prompt backup care is available to patients who undergo
abortions in outpatient clinics.").

The rational basis standard is no stranger to the judiciary.
Federal courts across the nation apply it regularly when
constitutional challenges are brought against state action.
Familiar as it may be, the district court failed to apply it,
proceeding instead as though the state bore the burden of
proving that its admitting-privileges law was reasonably
related to the health and safety of women seeking abortions.
*Van Hollen*, 94 F. Supp. 3d at 964 ("Since the State contends that
the admitting privileges requirement at issue is reasonably
directed to the health of women seeking abortions, it has the
burden of demonstrating this link.") (citations omitted).

That's exactly backwards. Under rational basis review,
courts must presume that the law in question is valid and
uphold it so long as the law is rationally related to a legitimate
state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.
432, 440 (1985). Since the Supreme Court has repeatedly
recognized the state's longstanding interest in protecting the
health and safety of pregnant women who have chosen
abortion, at this juncture, "we must presume that the

admitting-privileges requirement is constitutional, and uphold it so long as the requirement is rationally related to Wisconsin's legitimate interests." *Van Hollen*, 738 F.3d at 800 (Manion, J., concurring in part and in the judgment) (citations omitted). The party challenging an abortion restriction bears the burden of proving the government's action irrational. *See Mazurek*, 520 U.S. at 971 (citing *Casey*, 505 U.S. at 884). To prove a legislative act irrational, "the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citation omitted). This is a tall order because "the government may defend the rationality of its action on any ground it can muster." *RJB Props., Inc. v. Bd. of Educ. of Chic.*, 468 F.3d 1005, 1010 (7th Cir. 2006) (citation and internal marks omitted).

Thus, the inquiry for courts under rational basis review starts with this question: is there "any reasonably conceivable state of facts that could provide a rational basis" for the state regulation? *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *Abbott I*, 734 F.3d at 411. As demonstrated above, the answer to that question is yes. So the next question to ask is whether the state's means of promoting its regulation (admitting privileges) are reasonably related to the legitimate interest already established (patient safety). If that answer is also yes, then the regulation satisfies rational basis review, and we must uphold it. That the controversy implicates abortion does not alter the analysis because "[n]othing in the Supreme Court's abortion jurisprudence deviates from the essential attributes of the rational basis test, which affirms a vital principle of

democratic self-government." *Abbott II*, 748 F.3d at 594.[2]

**D. Admitting privileges further Wisconsin's legitimate state interest in patient safety.**

Admitting privileges are, in the words of the Fourth Circuit, "obviously beneficial." *Greenville Women's Clinic*, 317 F.3d at 363 (citation omitted). So beneficial, in fact, that the National Abortion Federation recommended them until only recently. At trial, Wisconsin's expert, Dr. James Anderson, Clinical Professor in the Department of Family Practice & Population Health at Virginia Commonwealth University School of Medicine, referenced a publication from the National Abortion Federation entitled *Having an Abortion? Your Guide to Good Care* (2000), which states that "[i]n the case of emergency, the doctor should be able to admit patients to a nearby hospital (no more than 20 minutes away)." Dkt. 244 at 237–40; Dkt. 126 ¶¶ 6-7.

Indeed, the medical community has long been of the opinion that admitting privileges provide a real benefit to the

---

[2] In its efforts to wrest this case from the ambit of rational basis review, the court assigns great weight to numerous studies and reports which contend that complications rarely occur after abortions and that those which do occur are not more frequent than other types of outpatient surgeries. But this is immaterial because courts do not weigh evidence when they apply rational basis review. *See Nat'l Paint & Coatings Ass'n v. City of Chic.*, 45 F.3d 1124, 1127 (7th Cir. 1995) (recalling that there is "never a role for evidentiary proceedings" under rational basis review). For the plaintiffs to prevail, they must prove that post-abortion complications *never* occur in Wisconsin, or that admitting privileges have no impact on safety. *See Heller*, 509 U.S. at 321 ("[T]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it.") (citation and internal marks omitted). However, that is not possible on this record, because the plaintiffs' own expert and the court-appointed expert testified that admitting privileges are beneficial because they make abortion safer.

health and safety of pregnant women seeking an abortion. In 2003, the American College of Surgeons issued a statement on patient-safety principles that was joined by the American Medical Association and the American College of Obstetricians and Gynecologists. They listed several "core principles," the fourth of which provided that: "[p]hysicians performing office-based surgery must have admitting privileges at a nearby hospital, a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital."[3]

Perplexingly, in this case, the AMA and ACOG have filed a joint amicus brief arguing that Wisconsin's admitting-privileges law is unconstitutional. Yet their brief makes no mention of their 2003 statement or their sudden, yet convenient, disavowal of one of their "core principles" related to patient safety. It appears from the trial testimony that plaintiff-doctors have simply decided that admitting privileges are only desirable insofar as they do not cause members of their guild to become ineligible to perform abortions.

*Abbott II* also supports this conclusion. There, the court observed that "[t]here are four main benefits supporting the requirement that operating surgeons hold local hospital admitting and staff privileges: (a) it provides a more thorough evaluation mechanism of physician competency which better protects patient safety; (b) it acknowledges and enables the importance of continuity of care; (c) it enhances inter-physician

---

[3] *See* American College of Surgeons, *Statement on Patient Safety Principles for Office-based Surgery Utilizing Moderate Sedation/Analgesia, Deep Sedation/Analgesia, or General Anesthesia*, Bulletin of the American College of Surgeons, Vol. 89, No. 4 (Apr. 2004), available at http://www.facs.org/fellows_info/statements/st-46.html (last visited Nov. 12, 2015).

communication and optimizes patient information transfer and complication management; and (d) it supports the ethical duty of care for the operating physician to prevent patient abandonment." *Abbott II*, 748 F.3d at 592. Here, the parties have consolidated these four categories of benefits into three. The trial record contains evidence that admitting privileges are rationally related to a legitimate state interest because they promote the health and safety of pregnant women seeking abortions in Wisconsin.[4] Therefore, at the first step of the *Gonzales* test, this requirement is subject to rational basis review. I address each benefit in turn.

*i. Continuity of care*

Continuity of care is beneficial to abortion patients because it reduces the "risk of injury caused by miscommunication and misdiagnosis when a patient is transferred from one health care provider to another." *Abbott II*, 748 F.3d at 595. Indeed, even plaintiff and expert witness Dr. Kathy King of Planned Parenthood agreed that continuity of care is a necessary ingredient when treating patients. Dkt. 243 at 155.

---

[4] The district court presupposed that the lack of required admitting privileges for other, more dangerous medical procedures showed that the only purpose of Wisconsin's law was to restrict safe, legal abortions. It also concluded that the immediate effective date after signing was clearly intended to close the clinics. But the legislative purpose was not to immediately close the clinics. The legislature approved the statutes several weeks before the governor signed the legislation. There is no evidence that their apparent failure to designate a specific effective date was anything other than a simple oversight. The preliminary injunction, with which I concurred, quickly cured that problem. Significantly, the preliminary injunction and the delay in connection with the trial enabled all of Planned Parenthood's abortion doctors to acquire admitting privileges.

Dr. King's opinion was shared by the court-appointed expert, Dr. Serdar Bulun, Chair of the Department of Obstetrics and Gynecology at Northwestern University's Feinberg School of Medicine, who also opined that "physician to physician communication is one of the most important requirements for optimal handling of a complication arising from a procedure," and that "communication should ideally take place between the physician performing the abortion and the physician at the hospital, who will be handling the complication." 7th Cir. Dkt. 44 at 4.[5] Dr. Bulun testified further that admitting privileges would have benefits "probably 90% of the time," Dkt. 244 at 60, and that while transfer agreements were important, "in an ideal world both [admitting privileges and transfer agreements] should exist." *Id.* at 61.

Likewise, Wisconsin's experts, including Dr. Anderson and Dr. John Thorp (a board-certified ob-gyn who teaches at the University of North Carolina's School of Public Health), opined that admitting privileges aided in promoting continuity of care.

---

[5] In its standing analysis, the court correctly recognizes that a woman who has had or is expecting to have an abortion does not want her name exposed as a plaintiff in a lawsuit challenging the constitutionality of the law regulating abortion practices. The same privacy concerns would be encountered if a woman suffering from an abortion-related injury had to go to the nearest emergency room. There she would have to give her name and disclose the cause of her injury (or else lie about it, suggesting that it must have been a natural miscarriage). She may also have to wait in line before being treated, or undergo preliminary examinations to determine the nature and source of the problem. If admitting privileges were in place, by contrast, the woman's operating physician could bypass any embarrassing delay and promptly secure the woman's admission and treatment upon arrival. In this way, the physician-to-physician communication facilitated by the admitting-privileges requirement would help protect the woman's privacy and promote more efficient remedial treatment.

*Id.* at 233 (Dr. Anderson); Dkt. 131 ¶ 22 & Dkt. 164 ¶ 15 (Dr. Thorp).

The opinions of these medical professionals are shared, too, by the Fifth Circuit, which concluded that "[r]equiring abortion providers to have admitting privileges would also promote the continuity of care in all cases, reducing the risk of injury caused by miscommunication and misdiagnosis when a patient is transferred from one health care provider to another." *Abbott II*, 748 F.3d at 595.

### *ii. Credentialing*

Similarly, the "credentialing process entailed in the regulation reduces the risk that abortion patients will be subjected to woefully inadequate treatment." *Id.* In other words, credentialing advances the state's interest in promoting patient health by helping ensure that doctors performing abortions are qualified. Dr. Geoffrey R. Keyes, president of the American Association for Accreditation of Ambulatory Surgery Facilities, opined that "credentialing and privileging serve important and necessary functions in contemporary medical practice, primarily to ensure that patients receive safe high quality care from providers with appropriate skill, training and experience." Dkt. 127 ¶ 15.

In addition to the testimony of Dr. Anderson, Dkt. 244 at 232–33, Dr. Bulun opined that a benefit of physicians having admitting privileges is "to ensure that the practicing physicians are appropriately qualified, trained and competent to practice in a specific area of medicine or surgery." 7th Cir. Dkt. 44 at 3. The Fifth Circuit agreed, stating that the "requirement that physicians performing abortions must have hospital admitting privileges helps to ensure that credentialing of physicians beyond initial licensing and periodic license renewal occurs."

*Abbott I*, 734 F.3d at 411.

   *iii. Accountability and peer review*

Finally, in addition to Wisconsin's experts and Dr. Bulun, plaintiffs' own expert witness, Dr. Douglas W. Laube, a Professor of Obstetrics and Gynecology at the University of Wisconsin Medical School, and past president of the American College of Obstetricians and Gynecologists, testified that accountability and peer review was a benefit to women's health promoted by Wisconsin's admitting-privileges requirement. Dkt. 244 at 65–66.[6]

## III

### A. Wisconsin's admitting-privileges requirement does not

---

[6] While the only issue on appeal is the mandate for admitting privileges, another very important purpose of Wisconsin's law was the requirement for ultrasounds. As I pointed out in my earlier concurrence, receiving an ultrasound before an abortion benefits women in several ways. For starters, the ultrasound would confirm the fact that she was pregnant. Once she saw or heard the heartbeat, she would be assured that there is not a mistaken pregnancy test or a spontaneous miscarriage that was not earlier detected. Thus she would avoid paying several hundred dollars for an unnecessary operation. Also, the ultrasound would help reduce medical uncertainty and disclose any potential complications, such as by enabling a more accurate assessment of the gestational stage of the pregnancy. The detection of twins might also give the woman second thoughts. But regardless of whether certain legislators hoped that an ultrasound would cause the woman to change her mind, the ultrasound indisputably provides important information facilitating a more fully informed decision, which cannot be seen as anything but a benefit to the woman (even if the abortionist might disapprove of her decision). The obvious benefits flowing from the ultrasound requirement show that Wisconsin's law is supported by a number of rational bases—all centered on the health and welfare of the woman—in addition to those advanced by the requirement for admitting privileges.

**impose an Undue Burden on a woman's ability to choose abortion.**

The record evidence I have cited establishes beyond a doubt that the Wisconsin State Assembly had a "rational basis to act" in passing this admitting-privileges law in order to protect the health and safety of pregnant women who choose abortion in Wisconsin. *See Gonzales*, 550 U.S. at 158. Given that "[r]egulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden," *Casey*, 505 U.S. at 877–78, the next question is whether this law has the effect of imposing an undue burden on the ability of women to choose abortion.

The *Casey* plurality first described the "undue burden" test as follows: "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. We said that, in application, "a court's proper focus must be on the practical impact of the challenged regulation and whether it will have the likely effect of preventing a significant number of women for whom the regulation is relevant from obtaining abortions." *Karlin*, 188 F.3d at 481. The Supreme Court then simplified *Casey*'s description of an undue burden by collapsing the purpose inquiry into the effects test. *See Gonzales*, 550 U.S. at 158; *Currier*, 760 F.3d at 460 n.4 (Garza, J., dissenting). That is the second step of our analysis.

As an intermediate appellate court, we are bound to apply standards established by the Supreme Court. When this case was first before us, however, the court majority shifted the burden to the state to justify the medical necessity of its admitting-privileges law and characterized the undue burden

standard for the district court to apply on remand as follows:

> The cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose an "undue burden" on women seeking abortions. The feebler the medical grounds, the likelier the burden, even if slight, to be "undue" in the sense of disproportionate or gratuitous.

*Van Hollen*, 738 F.3d at 798 (citations omitted). Although I concurred in that judgment affirming the preliminary injunction because the law provided no grace period for abortion doctors to acquire admitting privileges before the law requiring them took effect, I did not then—nor do I today—endorse the home-brewed "undue burden" standard that the court now doubles-down on. Simply stated, it finds no basis in *Gonzales*, *Casey*, or any other case law other than that which it created. *See Whole Women's Health v. Lakey*, 769 F.3d 285, 297 (5th Cir. 2014) ("Under our precedent, we have no authority by which to turn rational basis into strict scrutiny under the guise of the undue burden inquiry."). By reversing the burdens of proof, the court also implicitly rejects *Mazurek*, 520 U.S. at 971, which requires that the party challenging an abortion restriction bear the burden of proof. *See Abbott II*, 748 F.3d at 597.

**1. Effect of AMS's potential closure on the Undue Burden analysis**

In Wisconsin, Planned Parenthood operates abortion clinics in Milwaukee, Madison, and Appleton. Its abortion providers at each of those clinics have secured admitting privileges. Affiliated Medical Services (AMS) operates one abortion clinic

in Milwaukee. Drs. Dennis Christensen and Bernard Smith staff AMS and are, at present, the only abortion providers in Wisconsin to conduct abortions after 18.6 weeks LMP (commonly known as "late-term abortions"). Neither has secured admitting privileges. Consequently, the plaintiffs contend that AMS risks closure, and that, if that occurs, women seeking abortions in Wisconsin will face three undue burdens: (1) significantly increased wait times; (2) required travel to Chicago or other locations; and (3) no inpatient option for women seeking late-term abortions in Wisconsin. I address these arguments in turn.

### a. Wait times

Dr. King of Planned Parenthood testified that, if AMS were to close, it would "overwhelm the capacity of the Planned Parenthood of Wisconsin clinics to accommodate" the 2,500 women who incurred abortions at AMS in 2013. Dkt. 243 at 147–48. In crediting this testimony, the district court erroneously characterized the undue burden standard as requiring "access to abortion services in Wisconsin." *Van Hollen*, 94 F. Supp. 3d at 989. The Supreme Court's abortion jurisprudence carries no intrastate guarantee.

"Although all pre-viability regulations burden a woman's ability to obtain an abortion to some degree, the Court [in *Casey*] explained that an abortion law is not rendered unconstitutional merely because it operates to make it more difficult or more expensive to procure an abortion." *Karlin*, 188 F.3d 479 (citing *Casey*, 505 U.S. at 874). *Casey* rejected the notion that the abortion right is the right "to decide whether to have an abortion without interference from the State." *Casey*, 505 U.S. at 875 (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 61 (1976)) (internal marks omitted). Rather, the

abortion right recognized by *Roe* is the "right to be free from unwarranted governmental intrusion" in making the abortion decision. *Id*. (citation and internal marks omitted). Ultimately, *Casey* summarizes the undue burden standard as follows:

> Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Id.* 874 (citations omitted).

The Supreme Court has held that the constitutional right to privacy extends to a woman's right to choose abortion; it has not held, or even implied, that this right is *intrastate* in nature. To be sure, there is no constitutional right to obtain an abortion at the clinic of one's choice and at the time of one's convenience, just as one's right to free speech does not apply in all places a protester might desire to complain. In the same way that a state may reasonably regulate speech if it leaves open adequate alternative forums for expression, increased wait times at one clinic do not constitute an undue burden when other clinics within a reasonable distance remain open for business. *See, e.g., Abbott II*, 748 F.3d at 598 (clinic closure was not undue burden when another clinic was accessible within 150 miles); *Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595, 605 (6th Cir. 2006) (same within 45 to 55 miles); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 165 (4th Cir. 2000) (same within 70 miles).

AMS is one of four abortion clinics in Wisconsin and two in Milwaukee. Even if it closed, patrons seeking pre-18.6 week LMP abortions (approximately 98% of women seeking abortions in Wisconsin) would need to travel a mere 1.3 miles (four

minutes by automobile) to reach Planned Parenthood's Milwaukee clinic instead.[7]

The plaintiffs argue that the state creates an undue burden under *Casey* when a regulation designed to protect the health and safety of pregnant women decreases the availability of qualified abortionists. The implications of this argument are astounding. Taken to its logical end, this argument would require the state to assume some affirmative duty both to provide abortion services and to do so in a manner that is convenient for consumers of abortion and with no regard for the quality of healthcare professionals that a state's naturally occurring marketplace provides. The state bears no such obligation or duty. *Karlin*, 188 F.3d at 479 ("Although all pre-viability regulations burden a woman's ability to obtain an abortion to some degree, the Court explained [in *Casey*] that an abortion law is not rendered unconstitutional merely because it operates to make it more difficult or more expensive to procure an abortion.") (citation omitted).

While the Supreme Court has limited a state's ability to regulate abortions, it has never required a state to establish a command economy in order to provide them. That the market may disfavor abortionists is not the state's concern, but the

---

[7] Statistics indicate that approximately 98% of women seeking abortions in Milwaukee will not be impacted if AMS closes. In 2012, there were 6,927 abortions reported in Wisconsin. Dkt. 200 ¶ 9. That same year, AMS performed 131 post-20 week LMP abortions. Dkt. 243 at 29–30. Although these statistics do not account for the women who incurred abortions after 18.6 weeks LMP, but before 20 weeks LMP, the post-20 week number accounts for less than 2% of all abortions in Wisconsin. Women seeking the latest term abortions permitted by law have access to other clinics in Chicago that are well within a distance held not to be an undue burden, as I discuss below.

prerogative of the purveyors of that service. Like any enterprise that wishes to be a going concern, entities that wish to sell abortions must hire practitioners who are able to secure the necessary credentials on the basis of their professional reputations and their documented provision of skilled care.[8] In this instance, these credentials include admitting privileges.

The solution to the plaintiffs' problems is that they find more qualified doctors, not that the state relax—or that we strike down as unconstitutional—precautions taken by the state to protect the health and safety of pregnant women who have chosen to abort their pregnancies. *See Casey*, 505 U.S. at 875 (rejecting the notion that the abortion right is the right "to decide whether to have an abortion without interference from the State"). Lest there be any doubt, Wisconsin labors under no

---

[8] The court refers to a few hospitals that require doctors to have treated a certain number of patients there in order to obtain admitting privileges. Other hospitals might give admitting privileges to doctors who demonstrate competence in the particular procedure that the doctor seeks to perform. Of course, a hospital that requires delivering 100 live babies in the previous two years would not give the AMS doctors admitting privileges because, as the court observes, "delivering live babies is not what abortion doctors do." And as the court also noted when discussing the very low death rate for women who undergo abortions, the study cited measured long-term mortality rates "rather than death resulting from an abortion." However, to their credit, the Planned Parenthood doctors at the other three abortion clinics in Wisconsin have apparently demonstrated sufficient competence in medical procedures, perhaps even delivering live babies, to qualify for and to obtain the statutorily required admitting privileges. For women considering abortion, that credential that distinguishes them from AMS is worth noting. Although the court implies otherwise, it is safe to say that the Planned Parenthood doctors will not depend on the "rare" abortion complication to obtain a sufficient volume of hospital work to maintain their admitting privileges.

compulsory receivership that obligates it to intervene if the market fails to provide qualified abortionists within its boundaries. State inaction is not state action.

In short, there is simply no basis for us to disrupt the market for abortionists by interjecting ourselves: their abilities to qualify for admitting privileges, like "[t]he independent decisions of private hospitals[,] have no place in our review of state action under the Constitution." *Currier*, 760 F.3d at 460 (Garza, J., dissenting) (citation and footnote omitted).

**b. Required travel and availability of late-term abortions**

Consumers who live near the border of two states tend to shop at the closest destination, regardless of whether they reside in that state. Disregarding this routine assumption, plaintiffs argue that requiring women seeking abortion to travel outside the state to obtain late-term abortions creates an undue burden. Surprisingly, this argument finds some basis in the Fifth Circuit's recent decision in *Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014), where the court held that "the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state." However, our precedent squarely disagrees with *Jackson*: "the undue-burden standard must be applied . . . to the nation as a whole, rather than one state at a time." *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688 (7th Cir. 2002).

Turning towards distance rather than towards the governor's mansion, Chicago is approximately 93 miles from Milwaukee—or a one hour and forty minute drive. The Fifth Circuit recently held that Texas's admitting-privileges law did not impose an undue burden on a woman's right to choose

abortion because "travel of less than 150 miles for some women is not an undue burden under *Casey*." *Abbott II*, 748 F.3d at 598 (citation omitted). Before *Abbott II*, the Sixth Circuit similarly concluded that there was no undue burden under *Casey* where one of two Ohio clinics to conduct 18–24 week abortions was closed due to lack of a transfer agreement with a local hospital, even when the remaining clinic was located over 200 miles away. *See Baird*, 438 F.3d at 599, 605. Consistent with these authorities, it is well within the scope of *Newman* to conclude that the 93-mile trip from Milwaukee to Chicago to obtain an abortion does not impose an undue burden on a woman's ability to choose abortion. 305 F.3d at 688.

**2. Even if the undue burden standard applied to the market availability of abortion doctors, the AMS abortionists made minimal efforts to obtain admitting privileges.**

When this case was before us on the preliminary injunction, I asked plaintiffs' counsel at oral argument about the status of the plaintiffs' applications for admitting privileges at Wisconsin hospitals. Counsel was unable to confirm whether any doctors servicing the four abortion clinics in Wisconsin possessed admitting privileges, nor did she know the status of any pending applications by her clients to obtain them.[9]

*i. Planned Parenthood's efforts to obtain admitting privileges*

We know more now. At least six Planned Parenthood

---

[9] Of course, I recognize that, at the preliminary injunction stage, it was in counsel's clients' best interests for her to be non-responsive to my question because if she had informed us that some of her clients already possessed admitting privileges, some of the clinics would likely have remained open even in light of the law's immediate effect, and we may have been less likely to affirm the injunction entered by the district court.

abortion doctors—Dr. Susan Pfleger, Dr. Kathy King, and pseudonymous plaintiffs P1, P2, P3, and P5—all of whom did not have admitting privileges when this lawsuit was filed, have subsequently obtained them. *See Van Hollen*, 94 F. Supp. 3d at 988–89 . These individuals put forth sufficient efforts to obtain admitting privileges and were successful, proving that obtaining admitting privileges is not an insurmountable obstacle, even for abortion doctors.

*ii. AMS's efforts to obtain admitting privileges*

The same cannot be said of Drs. Christensen and Smith. Milwaukee has over two dozen hospitals,[10] yet Dr. Smith only attempted to apply for admitting privileges at one hospital (and had the AMS manager send an inquiry email to another). Dr. Christensen (who had admitting privileges for decades before entering semi-retirement) attempted to apply for admitting privileges at two hospitals, but did not attempt to satisfy their informational requests. In the words of the district court, these "efforts" demonstrate that both doctors "fail[ed] to exhaust all opportunities" to obtain admitting privileges. *Id.* at 987. I agree with that assessment. Moreover, while both doctors were savvy enough to obtain counsel for the purpose of initiating this lawsuit, neither did so to assist in their acquisition of the admitting privileges this lawsuit seeks to invalidate. Dkt. 211 at 48 (Dr. Smith); Dkt. 226 at 45 (Dr. Christensen). Despite plaintiffs' arguments to the contrary, indifference towards the law by abortion providers that results in an abortion clinic's potential closure does not create an

---

[10]     *See Discover Milwaukee - Metro Milwaukee Hospitals*, http://www.discovermilwaukee.com/healthcare-and-fitness/metro-milwaukee-hospitals/ (last visited Nov. 12, 2015).

undue burden.

## IV

I regret that today's decision marks the latest chapter in our circuit's continued misapplication of the Supreme Court's abortion jurisprudence. By a majority of one, the court has eliminated a measure that Wisconsin's elected officials have enacted to protect the health and safety of women who choose to incur an abortion. There is no question that Wisconsin's admitting-privileges requirement furthers the legitimate, rational basis of protecting women's health and welfare. Among other benefits, the requirement promotes continuity of care and helps to ensure that abortionists are properly credentialed and qualified. It also works in tandem with Wisconsin's ultrasound requirement to facilitate informed decision-making on the parts of doctor and patient alike. Nor is there any indication that the requirement would pose a substantial obstacle to women's ability to access abortion providers in their area. As Planned Parenthood's successful applications for admitting privileges demonstrate, the hospitals of Wisconsin are perfectly willing to grant admitting privileges to qualified physicians who perform abortions in their state. Because Wisconsin's admitting-privileges requirement has the rational basis of promoting the health and safety of pregnant women who have decided to incur an abortion, and because it does not impose an undue burden under *Casey*, I dissent.